WILLIAM E. ALBERTS vs. DONALD T. DEVINE & others.[1]

Norfolk. October 5, 1984. — June 4, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Practice, Civil,* Appeal, Report. *Privileged Communication. Privacy. Doctor,* Privileged communication. *Religion. Constitutional Law,* Freedom of religion.

A physician owes to a patient a duty not to disclose, without the patient's consent, confidential medical information about the patient obtained as a result of the physician-patient relationship, except to meet a serious danger to the patient or to others, and a violation of that duty, resulting in damages, gives rise to a cause of action sounding in tort against the physician. [65-69]

A person who induces a physician wrongfully to disclose information about a patient may be held liable to the patient for damages that flow from that disclosure provided that the person knew or reasonably should have known of the existence of the physician-patient relationship, intended to induce the physician to disclose the information or reasonably should have anticipated that his actions would induce such disclosure, and did not reasonably believe that the physician could disclose that information without violating the duty of confidentiality that the physician owed the patient. [70-71]

In an action seeking to establish the liability of persons who allegedly induced a physician wrongfully to disclose information about a patient, summary judgment was incorrectly ordered where the defendants failed to demonstrate that there was no dispute of material fact that they reasonably believed that the physician could give them the information they sought without violating his duty of confidentiality to the plaintiff. [71-72]

Where controversies arose concerning whether a church rule granted religious superiors the right to induce a psychiatrist to disclose confidential medical information about a patient, who was also a minister, and whether a causal connection existed between the psychiatrist's disclosure and the minister's failure to gain reappointment, the religion clauses of the First Amendment to the Federal Constitution, made applicable to the States by the Fourteenth Amendment, neither precluded inquiry by

[1] Edward G. Carroll and John E. Barclay.

the courts of the Commonwealth into the church's proceedings culminating in the minister's failure to gain reappointment, nor precluded imposition of liability on the clerical superiors. [72-74]

In an action by a minister against his psychiatrist and two of the plaintiff's clerical superiors alleging a wrongful disclosure of confidential medical information, the judge improperly invoked the religion clauses of the First Amendment to the Federal Constitution, made applicable to the States by the Fourteenth Amendment, in entering a protective order for the plaintiff's superiors precluding the plaintiff from obtaining discovery and trial evidence bearing on the issue whether a causal connection existed between the psychiatrist's disclosure and the plaintiff's failure to gain reappointment. [74-75]

CIVIL ACTION commenced in the Superior Court on March 4, 1975.

A motion to dismiss, a motion to amend the complaint, and motions for summary judgment were heard by *Elizabeth J. Dolan, J.*, and questions of law were reported by her to the Appeals Court. The Supreme Judicial Court transferred the case on its own initiative.

*Robert J. Doyle (Bruce V. Keary* with him) for the plaintiff.

*Florence E. Freeman* for John E. Barclay.

*Deborah S. Griffin & Ripley E. Hastings* for Edward G. Carroll & another.

*Jared H. Adams* for Donald T. Devine.

*Ann M. Gilmore,* for Ad-Hoc Committee of Methodist Ministers on the Separation of Church and State, amicus curiae, submitted a brief.

O'CONNOR, J. In this action, brought by William E. Alberts, a minister of the United Methodist Church, against Donald T. Devine, a psychiatrist, and Edward G. Carroll and John E. Barclay, two of the plaintiff's clerical superiors, we hold that: (1) unless faced with a serious danger to the patient or to others, a physician owes a patient a duty not to disclose without the patient's consent medical information about the patient gained in the course of the professional relationship, and the violation of that duty gives rise to a civil action for whatever damages flow therefrom; (2) a civil action will lie against anyone who, with the requisite state of mind, induces a viola-

tion of the physician's duty of confidentiality and thereby causes injury or loss to the patient; and (3) in the circumstances of this case, the religion clauses of the First Amendment to the Constitution of the United States,[2] made applicable to the States by the Fourteenth Amendment, *Everson* v. *Board of Educ.,* 330 U.S. 1, 15 (1947); *Cantwell* v. *Connecticut,* 310 U.S. 296, 303 (1940), do not preclude inquiry by the courts of the Commonwealth into church processes regarding the appointment and the discharge of ministers, nor do those clauses preclude the imposition of liability on the clerical defendants.[3]

Alberts's amended complaint alleges that in April, 1973, and for some period of time before that, he was a minister with the Southern New England Conference of the United Methodist Church (conference), that he and the defendant Devine had entered into a contract for the provision of psychiatric services, and that implicit in their relationship was a warranty that Devine would keep confidential "all information, observations and opinions relating to the diagnosis, condition, behavior, and treatment" of Alberts that Devine might gain in his professional capacity. The complaint further alleges that on or about April 9, 1973, in violation of that warranty and in violation of Devine's explicit promise, made during the course of treatment, to "respect the confidential nature of the relationship between doctor and patient," Devine disclosed to the defendant Carroll, Resident Bishop of the Boston Area of the United Methodist Church and President of the conference, or to Carroll's representative, information about Alberts's "diagnosis, condition, behavior or treatment." The complaint alleges that Carroll and the defendant Barclay, District Superintendent of the Greater Boston District of the conference, intentionally induced the disclosure, and that Carroll and Barclay "informed numerous individual members of the [conference],

___

[2] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[3] No contention has been made that the Constitution of the Commonwealth provides to any of the defendants greater protection than does the Constitution of the United States. Therefore, we do not consider any question of State constitutional law.

as well as the various boards, committees and subcommittees of that Conference concerned with the appointment of its ministers to local churches, of their opinions of [Alberts's] mental health." Furthermore, it is averred that Carroll expressed to the public and to news reporters his belief that Alberts "was mentally ill and therefore unappointable," and that his "belief was based on 'competent consultation.'" The complaint alleges that Carroll used the information he obtained from Devine to cause Alberts not to be reappointed as minister of the Old West Church in Boston, and that the unauthorized disclosures caused Alberts considerable loss of earning capacity and other financial losses, damage to his reputation, and great mental anguish requiring medical treatment.

The three defendants filed answers, and Carroll's and Barclay's answer, as amended, included the following defense: "The alleged actions by [Carroll and Barclay], if taken at all, were taken pursuant to their duties and authority as [Alberts's] superiors in the hierarchy of the United Methodist Church and as such are privileged and immune from inquiry by this Court under the First and Fourteenth Amendments of the United States Constitution."

The three defendants filed motions for summary judgment, and Devine filed a motion to dismiss. The judge allowed Carroll's and Barclay's motion for summary judgment, and she allowed their motions for entry of judgment pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). She denied both of Devine's motions. The judge also denied a motion filed by Alberts to amend his complaint by adding a count for tortious interference with privacy rights. Carroll and Barclay filed a motion for a protective order quashing any subpoena that might be served on them in connection with a trial of the case or on "any other person who was a member of the United Methodist Church in 1972 or 1973." The motion further requested that the judge limit further disclosure of, and exclude from evidence at trial, deposition testimony previously given, and documents previously identified, by Carroll and Barclay or other named individuals associated with the United Methodist Church. Lastly, the motion requested that the judge rule inadmissible

at trial "any evidence relating in any way to the conduct, words and thoughts of defendants Barclay and Carroll and of any other members of the United Methodist Church in 1972 or 1973." As grounds for their motion, Carroll and Barclay asserted a "constitutional prohibition of inquiry by the civil courts into matters of church doctrine and administration." The judge allowed the motion in its entirety.

At the same time that she made those rulings, the judge reported the following questions to the Appeals Court: (1) "[W]hether disclosures [of confidential medical information] by a psychiatrist of a former patient constitutes a cognizable cause of action within the Commonwealth of Massachusetts"; (2) "[W]hether a cause of action for invasion of privacy existed within the Commonwealth of Massachusetts prior to July 1, 1974"; (3) "[W]hether the actions of the defendants Barclay and Carroll are within the ambit of the privileges and immunities granted by the First and Fourteenth Amendments of the United States Constitution"; and (4) "[W]hether [the judge] properly invoked the First Amendment in entering the protective order for defendants Barclay and Carroll." We transferred the case to this court on our own initiative.

Before reaching the reported questions, we must consider a procedural matter: In light of the judgments entered for Carroll and Barclay, do our answers to the reported questions have any significance with respect to Alberts's claims against them? "[A]fter verdict or after a finding of facts under Rule 52 . . . [i]f [the judge] is of opinion that an interlocutory finding or order made by [her] so affects the merits of the controversy that the matter ought to be determined by the Appeals Court before any further proceedings in the trial court, [the judge] may report such matter, and may stay all further proceedings except such as are necessary to preserve the rights of the parties." Mass. R. Civ. P. 64, 365 Mass. 831 (1974). Under the rule, a trial judge may report a matter that ought to be determined at the appellate level before judgment is entered or before further proceedings take place. "In essence, the word 'report' connotes a suspension of the trial court's function pending decision by an appellate court." J.W. Smith & H.B.

Zobel, Rules Practice § 64.1 (1981). Rule 64 does not authorize a report after judgment.

It is not clear from the report nor from the judge's memorandum explaining the reasons for the report whether the judge intended that the answers to the reported questions would apply only to the claims against Devine or whether she also intended them to apply to the claims against Carroll and Barclay. In the memorandum, the judge discusses the relevancy of the questions to the claims against Devine, suggesting that, in keeping with rule 64, the judge reported the case solely to expedite the disposition of the claims against Devine. For example, the judge explained that the questions involving the religion clauses are important to the claims against Devine because, in order to establish damages as to Devine, particularly with respect to loss of earnings, Alberts would have to show that the information allegedly disclosed by Devine contributed to Alberts's loss of employment. The judge also observed that, in order to present that proof, inquiry will be necessary into "the processes of appointment or nonappointment by the governing body of the church together with consideration by a civil court of the interpretation and application of certain codes or canons of [the] church as embodied within its 'Book of Discipline.'" Other language in the memorandum, however, suggests that the judge intended that the Appeals Court's answers to the reported questions would also affect the claims against Carroll and Barclay. For example, the memorandum's concluding paragraph states: "The issues raised on the summary judgments are reported after decision and entry of final judgments as to Barclay and Carroll and the issues raised on interlocutory matters of the plaintiff's motion to amend to add a count of invasion of privacy and the denial of the defendant Devine's motion to dismiss for failure to state a cause of action cognizable by this court are further reported due to the nature of the complaint as filed and the status of the pleadings." Without arguing the procedural point, counsel for Carroll and Barclay have assumed that our answers to the questions will apply to Alberts's claims against them. In his brief, Alberts urges us to reverse the grant of summary judgment in favor of Carroll and Barclay, and, in

their briefs, Carroll and Barclay request that we affirm that grant. Carroll and Barclay also ask us to affirm the judge's denial of Alberts's motion to add to his complaint a common law claim for invasion of privacy. Although Alberts filed a timely claim of appeal from the entry of judgments in favor of Carroll and Barclay, he has not further perfected the appeal, apparently in reliance on the judge's report as a vehicle for review. See Mass. R. A. P. 5, as appearing in 378 Mass. 930 (1979). In light of that reliance, fairness requires that we treat the claims against Carroll and Barclay as if they were here on appeal, with Alberts assigning as error the unfavorable rulings by the trial judge on the reported questions. Therefore, our answers to the questions affect Alberts's claims against Devine, Carroll, and Barclay.

*Reported Question 1. A physician's duty not to disclose confidential information.* Until this case, we have not confronted the question whether a patient has a nonstatutory, civil remedy against a physician if the physician, without the patient's consent, makes an out-of-court disclosure of confidential information obtained in the course of the physician-patient relationship. In *Bratt* v. *International Business Machs. Corp.,* 392 Mass. 508 (1984), although we focused our attention on a different issue — whether the disclosure of medical information concerning an employee to an employer by a company physician violated the employee's statutory right of privacy granted by G. L. c. 214, § 1B — we "recognize[d] a patient's valid interest in preserving the confidentiality of medical facts relayed to a physician." *Id.* at 522. We also quoted with approval in *Bratt* the New Jersey Supreme Court's statement that "[a] patient should be entitled to freely disclose his symptoms and condition to his doctor in order to receive proper treatment without fear that those facts may become public property. Only thus can the purpose of the relationship be fulfilled." *Bratt* v. *International Business Machs. Corp., supra* at 522-523, quoting *Hague* v. *Williams,* 37 N.J. 328, 336 (1962).

We continue to recognize a patient's valid interest in preserving the confidentiality of medical facts communicated to a physician or discovered by the physician through examination.

"The benefits which inure to the relationship of physician-patient from the denial to a physician of any right to promiscuously disclose such information are self-evident. On the other hand, it is impossible to conceive of any countervailing benefits which would arise by according a physician the right to gossip about a patient's health." *Hague* v. *Williams, supra* at 335-336. "To foster the best interest of the patient and to insure a climate most favorable to a complete recovery, men of medicine have urged that patients be totally frank in their discussions with their physicians. To encourage the desired candor, men of law have formulated a strong policy of confidentiality to assure patients that only they themselves may unlock the doctor's silence in regard to those private disclosures. The result which these joint efforts of the two professions have produced . . . has been urged or forecast *in una voce* by commentators in the field of medical jurisprudence." *Hammonds* v. *Aetna Casualty & Sur. Co.,* 243 F. Supp. 793, 797 (N.D. Ohio 1965), and authorities cited therein. The Supreme Court of Oregon has recently held that a patient in that State has a civil right of recovery if a physician discloses without privilege confidential information obtained from the patient in the course of the physician-patient relationship. *Humphers* v. *First Interstate Bank,* 298 Or. 706 (1985). Patients in Massachusetts deserve no less protection.

Few cases consider the out-of-court physician-patient privilege. "That is undoubtedly due to the fact that the confidentiality of the relationship is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *MacDonald* v. *Clinger,* 84 A.D.2d 482, 483 (N.Y. 1982). Of the courts that have considered the question, most have held that a patient can recover damages if the physician violates the duty of confidentiality that plays such a vital role in the physician-patient relationship. See *Humphers* v. *First Interstate Bank, supra*; *Horne* v. *Patton,* 291 Ala. 701, 708-709 (1974); *Simonsen* v. *Swenson,* 104 Neb. 224, 227 (1920); *Hague* v. *Williams, supra* at 336; *MacDonald* v. *Clinger, supra* at 482; *Hammonds* v. *Aetna Casualty*

*& Sur. Co., supra* at 802 (Ohio law). Only three decisions have come to our attention in which courts have declined to recognize such a cause of action, and we do not find their reasoning persuasive. See *Logan* v. *District of Columbia,* 447 F. Supp. 1328, 1335 (D.D.C. 1978) (D.C. law); *Collins* v. *Howard,* 156 F. Supp. 322, 324 (S.D. Ga. 1957) (Georgia law); *Quarles* v. *Sutherland,* 215 Tenn. 651, 657 (1965).

The courts that have imposed on physicians a duty of confidentiality and have recognized a cause of action to enforce that duty have grounded their decisions on the determination that public policy favors the protection of a patient's right to confidentiality. Courts have found indications of that public policy in statutes creating a testimonial privilege with respect to confidential communications between a patient and a physician and in licensing statutes that authorize the suspension or revocation of a license to practice medicine if a doctor divulges a professional secret without authorization. The absence of statutes of that type, however, does not indicate that no public policy favoring a patient's right to confidentiality exists. No testimonial privilege statute existed in Alabama when the Supreme Court of Alabama decided *Horne* v. *Patton, supra.* Nor did such a statute exist in New Jersey when the Supreme Court of New Jersey decided *Hague* v. *Williams, supra.* The principle that society is entitled to every person's evidence in order that the truth may be discovered may require a physician to testify in court about information obtained from a patient in the course of treatment. However, that principle has no application to disclosures made out of court. Hence, it does not preclude a cause of action based on such disclosures.

In Massachusetts, the Legislature has demonstrated its recognition of a policy favoring confidentiality of medical facts by enacting G. L. c. 111, §§ 70 and 70E, to limit the availability of hospital records. Furthermore, G. L. c. 233, § 20B, creates an evidentiary privilege as to confidential communications between a psychotherapist and a patient. The fact that no such statutory privilege obtains with respect to physicians generally and their patients, *Bratt* v. *International Business Machs. Corp., supra* at 522 n.22, does not dissuade us from declaring

that in this Commonwealth all physicians owe their patients a duty, for violation of which the law provides a remedy, not to disclose without the patient's consent medical information about the patient, except to meet a serious danger to the patient or to others. See *Horne* v. *Patton, supra* at 709; *Simonsen* v. *Swenson, supra* at 227-229; *Hague* v. *Williams, supra* at 336; *MacDonald* v. *Clinger, supra* at 487; *Berry* v. *Moench,* 8 Utah 2d 191, 196-199 (1958); *Hammonds* v. *Aetna Casualty & Sur. Co., supra* at 797.[4]

It is true, as Devine argues, that no Massachusetts case before this one recognizes such a theory of liability. However, as we said in *George* v. *Jordan Marsh Co.,* 359 Mass. 244, 249 (1971), a case in which we recognized for the first time the tort of infliction of emotional distress, "[t]hat is true only because the precise question has never been presented to this court for decision. That argument is therefore no more valid than would be an argument by the plaintiff that there is no record of any Massachusetts law denying recovery on such facts. No litigant is automatically denied relief solely because he presents a question on which there is no Massachusetts judicial precedent. It would indeed be unfortunate, and perhaps disastrous, if we were required to conclude that at some unknown point in the dim and distant past the law solidified in a manner and to an extent which makes it impossible now to answer a question which had not arisen and been answered

---

[4] In *Bratt* v. *International Business Machs. Corp., supra* at 524, this court concluded that an employer may "have a substantial and valid interest in aspects of an employee's health that could affect the employee's ability effectively to perform job duties." We stated that "when medical information is necessary reasonably to serve such a substantial and valid interest of the employer, it is not an invasion of privacy, under [G. L. c. 214] § 1B, for a physician to disclose such information to the employer." *Id.* In that case, the physician was retained by the employer, and no physician-patient relationship existed. *Id.* at 510, 522 n.21. Furthermore, the court focused only on the privacy statute, and not on the nonstatutory duty of confidentiality we address today. The exception to the rule of confidentiality we announce today is not so broad as to permit a physician to disclose to a patient's employer whatever information might bear on the "employee's ability effectively to perform job duties." *Id.* at 524. Disclosure is permitted only to meet a serious danger to the patient or to others.

prior to that point. The courts must, and do, have the continuing power and competence to answer novel questions of law arising under ever changing conditions of the society which the law is intended to serve." In *Smith* v. *Driscoll,* 94 Wash. 441, 442 (1917), although the court found it unnecessary to determine "whether a cause of action lies in favor of a patient against a physician for wrongfully divulging confidential communications," the court "assumed" that "for so palpable a wrong, the law provides a remedy." We, too, believe that for so palpable a wrong, the law provides a remedy.

In *Hammonds* v. *Aetna Casualty & Sur. Co., supra* at 802-803, the court held that from the contractual relationship between a physician and a patient there arises a fiduciary obligation to hold in trust confidential information. In *MacDonald* v. *Clinger, supra* at 486, the court concluded that the physician-patient relationship "contemplates an additional duty springing from but extraneous to the contract and that the breach of such duty is actionable as a tort." This court previously has recognized that the physician-patient relationship possesses fiduciary (see *Warsofsky* v. *Sherman,* 326 Mass. 290, 292 [1950]), as well as contractual (see *Sullivan* v. *O'Connor,* 363 Mass. 579, 583 [1973]), aspects. We hold today that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty, resulting in damages, gives rise to a cause of action sounding in tort against the physician.

*Reported Question 2. Nonstatutory invasion of privacy.* On October 23, 1973, the Legislature approved St. 1973, c. 941, "An Act establishing the right of privacy and a remedy to enforce such right." The Act amended G. L. c. 214 by inserting § 1B, providing: "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."[5] As the parties recognize, the privacy statute does not apply here be-

[5] General Laws c. 214, as appearing in St. 1973, c. 1114, § 62, contained no § 1B, but, by St. 1974, c. 193, § 1, the Legislature reenacted § 1B as it appeared in St. 1973, c. 941.

cause the facts alleged by Alberts occurred in 1972, before the statute's enactment. Therefore, Alberts asks us to recognize for the first time a common law cause of action for invasion of privacy. Before the Legislature established a statutory right of privacy, this court stated that "[w]e need not discuss to what extent in Massachusetts violation of privacy will give rise to tort liability to individuals." *Commonwealth* v. *Wiseman,* 356 Mass. 251, 258 (1969). In a line of earlier cases, we explicitly refused to decide whether a common law right of privacy existed in this Commonwealth. See *Frick* v. *Boyd,* 350 Mass. 259, 263 (1966), and cases cited. We need not decide that question now. Even if there was a right of privacy at common law, that right would not permit recovery in this case beyond the recovery available for a physician's violation of the duty of confidentiality, recognized in our answer to reported question 1, and for the inducement of such a violation, recognized in our answer to question 3.

*Reported Question 3. Effect of the religion clauses.* Before discussing the religion clauses, we must consider whether, apart from them, a patient may hold liable one who induces a physician to violate the duty of confidentiality that the physician owes the patient. We hold that one who, with the state of mind we describe below, induces a physician wrongfully to disclose information about a patient, may be held liable to the patient for the damages that flow from that disclosure. The inducement need not be a threat, nor a promise of reward, but "may be a simple request or persuasion exerting only moral pressure." Restatement (Second) Torts § 766 comment k (1979).

To establish liability the plaintiff must prove that: (1) the defendant knew or reasonably should have known of the existence of the physician-patient relationship; (2) the defendant intended to induce the physician to disclose information about the patient or the defendant reasonably should have anticipated that his actions would induce the physician to disclose such information; and (3) the defendant did not reasonably believe that the physician could disclose that information to the defendant without violating the duty of confidentiality that the physi-

cian owed the patient. See *Hammonds* v. *Aetna Casualty & Sur. Co., supra* at 803; Restatement (Second) of Torts § 876(b) (1979) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows . . . (b) that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself"); Restatement of Torts § 757(c) (1939) (before one is subject to liability for use or disclosure of a trade secret obtained from another one must have notice of the fact that disclosure of the trade secret by the other is a breach of duty) (see *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.,* 381 Mass. 1, 5-6 [1980]); *Banks* v. *Everett Nat'l Bank,* 305 Mass. 178, 182 (1940) ("one who participates in the breach of trust by a fiduciary is responsible for the damages resulting to the trust if he knew that the fiduciary was committing such a breach or if he had knowledge of such facts that he could not reasonably be held to have acted in good faith"); Restatement (Second) of Torts § 766 comment i (1979) (to be subject to liability for interference with a contractual relationship a person must have knowledge of the contract and that he is interfering with it).

The principle we announce is but an application of the general rule that a plaintiff may hold liable one who intentionally induces another to commit any tortious act that results in damage to the plaintiff. See *Nelson* v. *Nason,* 343 Mass. 220, 222 (1961) (negligence); *Halberstam* v. *Welch,* 705 F.2d 472, 481-486, 487-489 (D.C. Cir. 1983) (burglary and murder); *Cobb* v. *Indian Springs, Inc.,* 258 Ark. 9, 16-17 (1975) (negligence); *Smith* v. *Thompson,* 103 Idaho 909, 911-912 (Ct. App. 1982) (arson); *Duke* v. *Feldman,* 245 Md. 454, 457 (1966) (assault and battery); *Rael* v. *Cadena,* 93 N.M. 684, 684-685 (Ct. App. 1979) (battery); *Russell* v. *Marlboro Books,* 18 Misc. 2d 166, 179 (N.Y. Sup. Ct. 1959) (libel).

In this case, deposition testimony established that Carroll and Barclay knew of the physician-patient relationship between Devine and Alberts and that they intended to induce Devine to disclose information about Alberts. To be entitled to summary judgment, therefore, apart from consideration of the

relationship between church and State, Carroll and Barclay had to demonstrate that there was no dispute of material fact that they reasonably believed that Devine could give them the information they sought without violating his duty of confidentiality owed to Alberts. Carroll and Barclay did not do so.

We now reach the third reported question: "[W]hether the actions of the defendants Barclay and Carroll are within the ambit of the privileges and immunities granted by the First and Fourteenth Amendments of the United States Constitution." We read the reported question to include two questions. First, do the religion clauses preclude the imposition of liability on Carroll and Barclay? And, second, in connection with Alberts's proof of damages, may the court constitutionally inquire into the church's proceedings that resulted in Alberts's failure to gain reappointment as minister of the Old West Church?

We begin with the recognition that the First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization. *Jones* v. *Wolf,* 443 U.S. 595, 602 (1979). *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich,* 426 U.S. 696, 709 (1976). *Presbyterian Church in the U.S.* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449 (1969). *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 727 (1871). See *United Kosher Butchers Ass'n* v. *Associated Synagogues of Greater Boston, Inc.,* 349 Mass. 595, 598 (1965); *Reardon* v. *Lemoyne,* 122 N.H. 1042, 1047 (1982). Carroll and Barclay claim that, as Alberts's clerical superiors, they had the duty to obtain information about Alberts's mental and emotional well-being, and that the Book of Discipline of the United Methodist Church privileged them to seek such information from Devine. They argue that the principle enunciated in the cases cited above precludes judicial inquiry into the merit of Alberts's claims against them and into the process by which the members of the church voted to retire Alberts. We disagree.

It is clear that the assessment of an individual's qualifications to be a minister, and the appointment and retirement of ministers, are ecclesiastical matters entitled to constitutional pro-

tection against judicial or other State interference. *Kedroff* v. *St. Nicholas Cathedral,* 344 U.S. 94, 116 (1952). *Gonzalez* v. *Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16-17 (1929). *Kaufmann* v. *Sheehan,* 707 F.2d 355, 358-359 (8th Cir. 1983). However, this case does not involve the propriety of the United Methodist Church's refusal to reappoint Alberts as minister of the Old West Church. Nor does this case involve Alberts's qualifications to serve as a minister. A controversy concerning whether a church rule grants religious superiors the civil right to induce a psychiatrist to violate the duty of silence that he owes to a patient, who happens to be a minister, is not a dispute about religious faith or doctrine nor about church discipline or internal organization. Nor is a controversy concerning the causal connection between a psychiatrist's disclosure of confidential information and a minister's failure to gain reappointment such a dispute.

Even if the First Amendment precludes judicial inquiry as to whether a church rule provided that Carroll and Barclay had the right to seek medical information from Alberts's psychiatrist, so that the court must assume in Carroll's and Barclay's favor the existence of a church rule granting that right, it does not follow that the religion clauses preclude the imposition of liability on Carroll and Barclay. Although the freedom to believe "is absolute," the freedom to act "cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection." *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 375 (1982), quoting *Cantwell* v. *Connecticut,* 310 U.S. 296, 303-304 (1940). See *Braunfeld* v. *Brown,* 366 U.S. 599, 603 (1961); *Reynolds* v. *United States,* 98 U.S. 145, 164 (1878).

A law, legislatively or judicially created, that would regulate or prevent religiously motivated conduct does not violate the First Amendment if the State's interest in the law's enforcement outweighs the burden that the law imposes on the free exercise of religion. A determination of constitutionality requires a balancing of the competing interests. See *Wisconsin* v. *Yoder,* 406 U.S. 205, 215-229 (1972). *Prince* v. *Massachusetts,* 321

U.S. 158, 164-170 (1944). *Cantwell* v. *Connecticut, supra* at 307. *Catholic High School Ass'n of the Archdiocese of N.Y.* v. *Culvert,* 753 F.2d 1161, 1169 (2d Cir. 1985). Obviously, the imposition of liability on Carroll and Barclay for inducing a violation of Devine's duty to Alberts would inhibit such conduct. We must determine whether such inhibition burdens the free exercise of religion by Carroll, Barclay, or the United Methodist Church, and if it does, we must then determine whether the Commonwealth possesses an interest sufficiently compelling to justify the burden. See *Wisconsin* v. *Yoder, supra. Sherbert* v. *Verner,* 374 U.S. 398, 403-409 (1963). *Catholic High School Ass'n of the Archdiocese of N.Y.* v. *Culvert, supra* at 1171. *Attorney Gen.* v. *Bailey, supra* at 375.

As we have observed, churches have a significant interest in assessing the qualifications of their ministers, and in appointing and retiring them. But, in view of the freedom that ecclesiastical authorities and church members have to determine who the church's ministers will be, and in view of the numerous sources of relevant information available to assist those making such determinations — other than information available only from a minister's physician — a rule that prevents interference with physician-patient relationships will have little impact on the free exercise of religion. On the other hand, as we have discussed earlier in this opinion, public policy strongly favors judicial recognition of a physician's duty to honor the confidentiality of information gained through the physician-patient relationship. We conclude, therefore, that even if it be assumed, without inquiry, that the Book of Discipline or other rule of the United Methodist Church provides that Carroll and Barclay had a right, or even a duty, to seek medical information about Alberts from Devine, the First Amendment does not preclude the imposition of liability on those defendants. We also conclude that the First Amendment does not bar judicial inquiry into the church's proceedings culminating in Alberts's failure to gain reappointment.

*Reported Question 4. Protective order.* The final reported question asks: "[W]hether [the judge] properly invoked the First Amendment in entering the protective order for defendants

Barclay and Carroll." We answer that question "no." As we have stated, the First Amendment does not preclude civil courts from examining the proceedings that resulted in Alberts's failure to gain reappointment as minister of the Old West Church in order to determine whether that event resulted from wrongful conduct of the defendants. Accordingly, the First Amendment does not present an obstacle to Alberts's right to discovery and trial evidence bearing on that issue. This litigation in no sense involves repetitious inquiry or continuing surveillance that would amount to the excessive entanglement between government and religion that the First Amendment prohibits. See *Lynch* v. *Donnelly,* 465 U.S. 668, 672-673 (1984); *Lemon* v. *Kurtzman,* 403 U.S. 602, 611-625 (1971); *Walz* v. *Tax Comm'n of the City of N.Y.,* 397 U.S. 664, 668-669 (1970); *Surinach* v. *Pesquera de Busquets,* 604 F.2d 73, 78 (1st Cir. 1979).

*Conclusion.* We hold today that, absent the patient's consent or a serious danger to the patient or to others, a physician owes to a patient a duty not to disclose information gained through the physician-patient relationship, and a violation of that duty gives rise to a cause of action sounding in tort. Therefore, we answer reported question number one "yes." No answer to reported question number two is required. Finally, we conclude that the religion clauses of the First Amendment do not preclude the imposition of liability on Carroll and Barclay nor bar the courts of this Commonwealth from inquiring into the church's proceedings that resulted in Alberts's failure to gain reappointment as minister of Boston's Old West Church. Therefore, we answer reported questions number three and four "no," and, because Carroll and Barclay have not established by uncontroverted affidavits and other supporting materials that Alberts cannot prove his claims, we reverse the grant of summary judgment in favor of Carroll and Barclay and the judgments entered pursuant thereto, vacate the protective order entered below, and remand this case to the Superior Court for further proceedings not inconsistent with this opinion.

*So ordered.*