Robert **BRATT**, et al.,
Plaintiffs, Appellants,

v.

**INTERNATIONAL BUSINESS MA-
CHINES CORPORATION, et al.,**
Defendants, Appellees.

No. 85–1545.

United States Court of Appeals,
First Circuit.

Argued Dec. 4, 1985.

Decided March 6, 1986.

David C. Casey, with whom Peckham, Lobel, Casey & Tye, Boston, Mass., were on brief, for plaintiffs, appellants.

Edward P. Leibensperger, with whom Linda J. Kline, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for defendants, appellees.

Before BOWNES and BREYER, Circuit Judges, and TAURO,[*] District Judge.

BOWNES, Circuit Judge.

This appeal marks the third time we have reviewed the claims of Robert Bratt, an employee of IBM, against physician Martha Nugent, IBM Vice-President Wesley Liebtag, and IBM itself for breach of privacy. Our first review came as a result of the district court's refusal to allow Bratt to file a fourth amended complaint and its grant of a summary judgment for defendants on both privacy and libel claims. We found at that time that there was no clear, controlling Massachusetts precedent on issues of privacy and libel law which were critical to the resolution of this case and certified a series of four questions to the Massachusetts Supreme Judicial Court. These questions were answered in *Bratt v. IBM*, 392 Mass. 508, 467 N.E.2d 126 (1984). In light of these answers, we then affirmed the district court's dismissal of the libel claims against defendants. We found, however, that the standard of privacy articulated by the Supreme Judicial Court required further findings and rulings by the district court and we reversed the grant of summary judgment as to the privacy claims and remanded the case to the district court. 745 F.2d 43. The district court again granted summary judgment for the defendants on the breach of privacy claims and it is this ruling which is before us. The issues are whether the district court erred in granting summary judgment for the defendants on the breach of privacy claims and in not allowing Bratt oral argument on defendants' motion for summary judgment.

# I. FACTUAL BACKGROUND

Plaintiff, Robert Bratt, has been employed by International Business Machines Corporation (IBM) in Massachusetts since March of 1970 and continues to be an employee of IBM. Bratt's allegations of breach of privacy against IBM, its Vice-President Liebtag, and Dr. Nugent stem from what he claims was impermissible disclosure by the defendants of two matters: his use of a confidential grievance procedure called "open door" and information about his medical problems.

IBM's "open door" policy can best be described by quoting from the IBM Manager's Manual.

### A. Employee Appeal

1. Any employee who has a problem which has not been resolved to that employee's satisfaction by his or her immediate manager may bring the complaint or concern to the attention of higher management.

2. While the employee will normally choose to address an appeal first at the local level, the Open Door procedure makes available to an employee either direct or progressive access to any level of management in the Corporation.

. . . .

4. If the employee is still not satisfied the problem may be reviewed with the IBM Chief Executive Officer by mail, or personally if that is appropriate to the resolution.

5. Management should be sensitive to assure that no action is taken which may appear to be retaliation for an employee's appeal under the Open Door Policy. . . .

### B. The Investigation Process

. . . .

4. ...

c. the investigation can not be anonymous; however, the discussion will be restricted to those necessary to resolve the issues. Those consulted will be advised to keep the matter confidential.

In 1971, Bratt was promised a promotion and salary raise if he transferred from the Waltham office to the Cambridge office. He consented to the transfer, but received

[*] Of the District of Massachusetts, sitting by designation.

no promotion or raise. He, therefore, exercised his right to consult with supervisors under the open door policy. This resulted in Bratt receiving the promotion and raise promised. In 1975, while working for the Burlington office, Bratt did not receive a promotion he thought was due. Bratt again resorted to the open door grievance process, but this time without success. Bratt was transferred to the Waltham office with no promotion or pay increase. In 1980, he learned that he had actually been demoted at the time of this transfer.

While at Waltham, Bratt made several suggestions for improving control of the cash-fund account. These suggestions were initially rejected, but, after a bad audit, were later implemented with good results. The cash-fund office as a whole was given credit for this turnaround, minimizing what Bratt felt was his individual contribution. In July of 1977, Bratt was given a lower work rating than he thought he deserved. His second level manager, Ed Simpson, refused to discuss it with him. Also during this period, Bratt's wife was in the hospital being tested for cancer. He asked for a whole or a half day off and was refused by Simpson. He immediately went higher up and was given the time off. During 1978, Bratt discovered that copies of suggestions he had made for combatting embezzlement problems in the Waltham office were missing from his files, including one suggestion he thought had been adopted companywide, but for which he had not received any credit. Upon inquiry to the Suggestions Department, Bratt was informed that no such suggestions had been made. Bratt began to feel that his manager, Simpson, held it against him that he had used the open door process in 1975 which led to his transfer to Waltham. Bratt's concern that he was being discriminated against for his use of the open door process and that his work was not being appreciated led him again to the open door in May or June of 1978. This open door process was handled by David Blackburn, a higher level manager.

By September 1978, Bratt had still not received any response from Blackburn, so he exercised his open door privilege with Dr. Cary, the Chairman of the Board of IBM. At about the same time, Blackburn responded to his complaints and told him that his suggestions had been turned down and that the 1977 low work rating would be destroyed. Dr. Cary then appointed Wesley Liebtag to handle Bratt's open door complaints and review Blackburn's handling of the latest one. Bratt apparently asked Liebtag to make sure that the 1977 work appraisal was no longer in his personnel file and to investigate what happened to the suggestions he made. On October 3, 1978, Bratt met with Liebtag, who had been assured by Blackburn that the 1977 appraisal had been destroyed. Liebtag told Bratt that his suggestions had been properly processed and evaluated.

Bratt returned to his Waltham office, after the interview with Liebtag, discouraged with his career problems. He spoke to his immediate supervisor, Rita Lynch, and told her that he thought Liebtag, Blackburn and others were all lying and that it was a big "cover-up." The next week, after missing a day of work, Bratt told Lynch that his nerves were bad, he had headaches and he couldn't sleep because of his previous bad treatment. He told Lynch that he had gone to see his doctor over this and Lynch asked if he wanted to talk to the IBM doctor. He told her that it might be a good idea for him to have a second opinion and that he was going to request a transfer and list health as one of his reasons for transfer. On Monday, October 16, 1978, Bratt submitted a request for transfer stating three reasons: health, unfair management situation, and unfair work situation. Lynch set up an appointment for Bratt with Dr. Martha Nugent, a general practitioner with a private office in downtown Boston.

IBM maintains its own medical department staffed with "in-house" physicians. Dr. Nugent was not an "in-house" IBM doctor, but was an independent physician under contract to IBM. In IBM terminology, she was a "local examining physician." At the time of Bratt's consultation with Dr.

Nugent, IBM had in force a policy which limited and conditioned management access to employee medical records kept by the medical department:

> Prior approval of the employee (signed Medical Information Release form) will be obtained before either disclosing or seeking confidential medical information, except in an emergency or where such disclosure is required by law.
>
> . . . .
>
> As appropriate, managers, Personnel and employees will be furnished recommendations concerning medical limitations pertaining to particular job requirements, but medically confidential information will not be provided to managers or Personnel without prior consent of the employee.

Under company regulations, management was also constrained from having direct contact with local examining physicians:

> The company is realistically concerned about the health of its employees. Therefore, each manager must remain alert to the health of the employees in his department. Any advice or guidance the manager may need in handling medical or psychiatric problems should be obtained through the regional medical director. The regional medical director will work with local examining physicians as appropriate.

Although the record indicates that local examining physicians received separate instructions on medical procedures and practices from the regional medical department, there is nothing in the record indicating that Dr. Nugent received them or was informed of IBM's medical-records policy. It is undisputed that Bratt never consented to release of medical information by Dr. Nugent to IBM's medical or management staff or by the IBM medical department to IBM's management staff.

After a routine physical examination, Dr. Nugent called Lynch and told her that Bratt was paranoid and recommended that he immediately see a psychiatrist. Lynch conveyed this information to her supervisor, Johanna Crawford, who called Leibtag and told him that Bratt had seen a physician in Boston who felt that he was paranoid. Leibtag made a memo to file of the conversation with Crawford. It stated:

> This memo was prepared subsequent to the other memo carrying the same date. I have now been advised by Johanna Crawford, the branch manager, that Mr. Bratt has seen a physician in Boston who has expressed his view that he is paranoid. The physician is recommending that Bratt see a psychiatrist and indications are that Bratt will accept the recommendation.
>
> The physician has recommended that no changes in his assignment—i.e., no transfer—be effective until the analysis is completed. Johanna intends to comply with the physician's recommendation.

On October 19, 1978, Bratt was informed that his latest "open door" grievance had been denied. A memo dated October 19, 1978, from Leibtag to T.A. Vadnais with a copy to D.E. McKinney, both IBM managerial supervisors, describes what happened:

> Johanna Crawford called at 4:10 on October 19, 1978 to say that this morning when Mr. Bratt received the close out Open Door letter, he came into her office looking terribly distraught and said, "What do I do now?"
>
> Johanna encouraged him to go back to work.
>
> He immediately went into his first line manager's office and stood there with his hands over his eyes sobbing, having first put the letter on her desk. Crawford immediately got in touch with the psychiatrist who gave him an appointment this afternoon and a second appointment for 7:00 AM tomorrow morning.
>
> Crawford will keep me advised as things unfold. But, it appears that the psychiatrist's first reaction, that there is a mental problem that goes beyond IBM, is accurate.
>
> I suggested to Crawford that she get in touch with Dr. Duffy, the corporate medical director, and have him in turn speak with the physician so that we are obtaining physician-to-physician input

and so we have John's expertise available to us for interpretation of the results.

On the same day, October 19, 1978, Rita Lynch wrote a memo to Blackburn, the manager who had been involved in reviewing Bratt's open door complaints, summarizing the incidents of the prior two weeks and including Dr. Nugent's assessment of Bratt as paranoid. Over the next several days, there appear to have been numerous telephone calls concerning Bratt by his immediate managers, Lynch and Crawford, to members of the IBM medical staff: Dr. Duffy, the corporate medical director; Dr. McLean, the Eastern Medical Director; and Dr. Silverberg, a staff physician. In addition, Dr. McLean noted a call from Vic Bovine, another one of Bratt's managers who was in charge of employee medical insurance coverage and charges. On October 25, 1978, Dr. Nugent spoke with Dr. Silverberg and told him that she thought Bratt was "rather paranoid." On November 9, 1978, Dr. Nugent wrote to Dr. McLean and informed him that she found Bratt "quite paranoid." Rita Lynch called Dr. Silverberg on November 15, 1978, to report that Bratt was leaving early and not performing adequately. On December 11 and 12, Dr. Nugent spoke to Dr. Silverberg, apparently acting as a go-between for Bratt's psychiatrist and the IBM medical staff. At this point it was decided that Bratt should go on three months medical leave. This conversation was followed up by a letter to Dr. Silverberg on December 19, 1978.

Toward the end of Bratt's medical leave, Bratt's medical history sheet shows that Dr. Silverberg spoke to D. Silva, Lynch's secretary, who was covering for Lynch, and was told that "Bratt came in last week looking well and talking optimistically." After medical leave, Bratt was placed in a temporary assignment in Cambridge, under the supervision of Tom Wolfe. After receiving a call from Bratt's psychiatrist indicating that Bratt was very happy in his new job, Silverberg called Wolfe to tell him that the psychiatrist had said that Bratt was enjoying his work and to find out what Wolfe was doing to bring this about. Fi-

nally, in September of 1979, Dr. Silverberg was asked by P. Strohm, an IBM manager in charge of finding a new assignment for Bratt, whether there were any medical obstacles to be considered in placing Bratt. Dr. Silverberg told Strohm that Bratt's doctor had said he could return to his usual work.

During this period, Bratt was being considered for a permanent job at the Cambridge Center; however, according to a memo between Wolfe, his supervisor, and Dick MacKinnon, the manager of the Cambridge Center, MacKinnon did not want anyone with Bratt's open door use history. This memo came to Bratt's attention and he became very upset about his work situation and initiated yet another open door process in September of 1979. He went to Liebtag and complained that he had not yet received a permanent job assignment. He also told Liebtag that he believed that the 1977 work appraisal had not been destroyed as both Blackburn and Liebtag had promised. In fact, the 1977 appraisal was still in Bratt's personnel file; it was subsequently removed and destroyed in Bratt's presence on Liebtag's orders. As part of his handling of this open door, Liebtag sent a memo to W.W.K. Rich, whose position in the IBM hierarchy is not identified in the record. The memo stated that Liebtag told Vic Leventhal, the regional administration manager, to be sensitive to "any medical/mental problems that may exist."

## II. FINDINGS AND RULINGS

Four counts of Bratt's original seven remained for consideration on remand to the district court: Count III alleged that IBM, through Liebtag, violated his right of privacy by "informing other management employees, including his immediate managers" of his assertion of his open door rights. Count V alleged that Wesley Liebtag had violated Bratt's right of privacy by distributing the memos of October 1978 and September 1979, which stated that a physician considered Bratt paranoid and a psychiatrist believed that there was a mental problem "beyond IBM." Count VI al-

leged that IBM violated Bratt's right of privacy by allowing discussion of his medical problems between Dr. Nugent and IBM management without obtaining a signed release authorizing disclosure. And fourth, Count VII alleged that Dr. Nugent violated Bratt's right of privacy and confidentiality by talking to IBM management staff without obtaining authorization or a release.

"The test established by the Massachusetts Supreme Judicial Court for determining whether communication of personal information about an employee by an employer violates the statutory right of privacy requires a balancing of the "employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure." *Bratt v. IBM Corp.*, 467 N.E.2d at 135–36. This would include the communication of medical information by the employer as well as other kinds of information. The test for whether an employee's right of privacy is violated by a physician's disclosure of personal medical data involves a balancing of "the degree of intrusion on privacy and the public interest in preserving the confidentiality of a physician-patient relationship balanced against the employer's need for the medical information." *Id.* at 137. The Supreme Judicial Court determined that "when medical information is reasonably necessary to serve such a substantial and valid interest of the employer, it is not an invasion of privacy, under 1B, [of the statute] for a physician to disclose such information to the employer." *Id.*

The district court held that the test articulated by the SJC was essentially whether disclosure "constituted an unreasonable interference with a person's privacy." Recognizing that questions of reasonableness are usually reserved for the fact finder, the district court went on to find that in this case "no rational view of the evidence warrants a finding that defendants acted unreasonably under all the circumstances" and granted summary judgment for the defendants. The court found on Bratt's claim that his privacy was violated by ex-

cessive disclosure concerning his use of the open door process that "there was no evidence in the record that ... [this] information 'was published more widely than to managerial employees who had a legitimate interest in the information because of its bearing on Bratt's work assignments.'" As to the disclosure of information about Bratt's medical condition, the district court first concluded that, contrary to Bratt's allegations that Liebtag's October 18 and 19 memos were disseminated to as many as sixteen people, the evidence did not support dissemination to more than two managerial employees, and this would not be an unreasonable disclosure since the information was of legitimate interest to these employees. The district court further found that, even if all sixteen people had learned of Bratt's medical problems, this would not have been unreasonable. In arriving at this conclusion, the district court weighed two factors: the IBM internal regulations about the disclosure of medical information; and the extent to which Bratt himself made disclosures about his medical problems or impliedly authorized conversations about them by discussing his medical problems with his supervisors. The court concluded that, under the circumstances of this case, the defendants' disclosures about Bratt were not an unreasonable interference with his right of privacy.

Bratt argues that the district court erred in deciding by summary judgment the issue of the reasonableness of the conduct of IBM, Liebtag and Dr. Nugent. He particularly emphasizes that most of these disclosures were made in violation of IBM policy and that as such cannot be considered clearly reasonable. In a similar vein, Bratt argues that IBM cannot have a legitimate business interest in unrestricted access to information to which it has voluntarily limited its own access. Bratt also argues that the district court assumed, without actually finding, that each individual who received this information had a legitimate business interest in it.

■ Summary judgment is proper only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.Pro. 56(c). The court must "indulge in all inferences favorable to the party opposing the motion." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Where the critical issue in a case is the reasonableness of a defendant's behavior, as it is here, summary judgment will only be appropriate where no reasonable fact finder could find the defendant's conduct unreasonable under the agreed facts. *Taylor v. Gallagher*, 737 F.2d 134, 137 (1st Cir.1984). With this standard in mind, we review the district court's grant of summary judgment for defendants IBM, Liebtag, and Dr. Nugent on all four privacy counts.

■ We consider each count separately. Count III charges IBM with revealing information about Bratt's use of the open door process to managerial employees not directly involved in the open door process. Although not specifically alleged in the complaint, we assume that this count was meant to encompass Bratt's claim that the manager of the Cambridge center knew of his history of using the open door process and that this formed the basis for his unwillingness to let Bratt work there. Bratt also alleges by affidavit that the three copies of Liebtag's October memos found in the "Waltham file" during discovery were kept in Waltham and were available to numerous Waltham employees, including MacKinnon, the manager of the Cambridge Center. An affidavit by the IBM attorney responsible for this case states, contrary to Bratt's suggestion, that the file was created in response to Bratt's litigation and was kept at IBM headquarters in New York.

We agree with the district court that no reasonable fact finder could conclude that there had been an unreasonable intrusion upon Bratt's privacy by the limited dissemination of the fact that Bratt had used the open door process several times. The information itself, although it may have had a negative connotation to some managers, is not of such a personal nature that an intrusion upon privacy results from its disclosure. *Cf. Hastings & Sons Pub. Co. v. City Treasurer*, 374 Mass. 812, 375 N.E.2d 299, 303 (1978) (no breach of privacy in disclosure of payroll records because information not "intimate" or "highly personal"). This is especially true because the open door process necessarily involved the disclosure of the complaint to any person who was Bratt's immediate manager so that a full investigation could be made. Most of the sixteen or more persons he claims knew of his rather extensive use of the open door process were directly involved in the process, either as investigators, supervisors of investigators, or persons investigated. There can be no question that these individuals had a legitimate business need for this information and that Bratt's voluntary use of the open door process essentially waived any claim of breach of privacy *vis-a-vis* these persons. This leaves only Bratt's claim that MacKinnon was improperly apprised of his open door history by Liebtag's distribution of the October memos in the "Waltham file." It is Bratt's contention that this improper distribution is a disputed issue of fact which must go to the jury. We cannot agree. Plaintiff is not permitted to build a case "on the gossamer threads of whimsy, speculation and conjecture." *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir.1962). The October memos indicate on their face that copies were sent to D.E. McKinney, the IBM Vice-President of Personnel, and T.A. Vadnais, Administrative Assistant to the Chairman of the Board, both of whom supervised Liebtag's work. There can be no serious question that the three copies of the memo found in the file are precisely the three copies made by Liebtag, one of which was kept in his own file and two of which he sent to his supervisors. Bratt's suggestion that the "Waltham file" containing these memos was anything other than a file compiled as a result of this litigation is mere speculation. Given the insubstantial nature of the

intrusion upon Bratt's privacy caused by the disclosure of this information and the mere speculation that it was improperly disclosed, the district court properly granted summary judgment for IBM on Count III.

We now turn to Count V which alleges that Liebtag violated Bratt's privacy by distributing the memos of October 18 and 19 which stated that Bratt was paranoid and had a mental problem and by informing Rich and Leventhal of Bratt's mental problems in September of 1979. Once again, the test for a violation of privacy is whether the substantiality of the intrusion on the employee's privacy which results from the disclosure outweighs the employer's legitimate business interest in obtaining and publishing the information. The personal nature of the information is one factor to be considered in determining the substantiality of the intrusion. The information at issue in this case—Bratt's mental state—is clearly more personal than the open door information at issue in Count III. The more personal the information disclosed, the greater the intrusion upon an individual's privacy. On the other hand, we must also consider the degree of disclosure. A limited disclosure will result in a less substantial intrusion than will widespread disclosure. The disclosures at issue here are those created by Liebtag's October 1978 memos and September 1979 discussion with Leventhal and memo to Rich. We have already found that Bratt's claim that the October memos were widely distributed is pure speculation and we cannot assume that the memos went any further than the two individuals to whom they were sent. This means that a total of four individuals were apprised that Bratt might have a mental problem, two during the 1978 open door and two during the 1979 open door.

We must balance the degree of intrusion on privacy created by this disclosure against the legitimate business interest in that information held by the employees to whom the disclosure was made. Two of the people who learned of Bratt's mental problems from Liebtag were his supervisors, McKinney and Vadnais. A third, Leventhal, was responsible for finding Bratt a permanent job after his three-month medical leave. The fourth person apprised of Bratt's mental problem was Rich. Bratt has not pointed to any internal IBM regulations which limited managerial disclosure of medical information to other managerial employees. It cannot be said, given the nature of the complaints Bratt made during the 1978 and 1979 open door grievances, that the possibility that Bratt was suffering from some sort of paranoia was not relevant to an evaluation of his complaints and any decision about what should be done with him. We do not believe that any reasonable fact finder could have found that the limited disclosure made here was unreasonable in light of the legitimate interest the individuals who received the information had in it. We affirm the district court's grant of summary judgment for the defendants on Count V.

We turn to Count VI. Count VI charges IBM with a breach of privacy because it allowed Dr. Nugent to discuss Bratt's medical problems with IBM management without his permission. This count may also include, although Bratt's pleadings, memos, and brief are vague on this, a claim that the IBM medical staff breached Bratt's privacy through its discussions of his medical problems with IBM management personnel. Again, we balance the substantiality of the intrusion upon Bratt's privacy against the legitimate business interests of those to whom disclosure was made. Because the crux of this claim is that the disclosure which occurred violated IBM's own internal regulations concerning the disclosure of medical information by the medical staff to the management, we must determine how these regulations should be factored into the balancing test. The existence of company regulations protecting the confidentiality of medical information serves to enhance an already existing expectation of privacy concerning information of this kind. The substantiality of an invasion upon privacy is

thereby increased where a company violates such internal regulations. In addition, where a company has established certain information as private and has set up strict rules for the publication and use of such information internally, the company has imposed on itself a heavy burden of showing that its business interest in obtaining the information warrants a violation of its own rules.

The district court concluded that, despite the existence of these internal rules, no rational fact finder could conclude that the disclosure of this information to the managerial employees unreasonably violated Bratt's right of privacy because they had a legitimate business interest in obtaining the information. We do not believe the result of the balancing test established by the Massachusetts Supreme Judicial Court is foreordained. A rational fact finder might decide, given the expectation of privacy created by IBM, that the disclosures made by Dr. Nugent and the medical staff were a substantial intrusion into Bratt's privacy. Such fact finder could further conclude that IBM managerial employees did not have a legitimate interest in obtaining this information in a manner which violated IBM's internal rules. The documentary evidence provided by Bratt was sufficient to create a genuine issue of material fact concerning the extent of the disclosure of Dr. Nugent and the IBM medical staff and, "look[ing] at the record ... in the light most favorable" to Bratt, *Hahn v. Sargent*, 523 F.2d at 464, we do not find that a rational fact finder would necessarily come to the conclusion reached by the district court. The district court erred in granting summary judgment for the defendant IBM on Count VI.

The final count is Count VII, which alleges that Dr. Nugent violated Bratt's right of privacy and confidentiality by discussing the results of her examination of Bratt with IBM management staff without his permission. In our certification request to the Massachusetts Supreme Judicial Court, we stated that Dr. Nugent was "a general practitioner retained by IBM." In answering the question directed to the standard applicable to a physician's disclosure of medical information to an employer, the Massachusetts Court stated that "we would consider the degree of intrusion on privacy and the public interest in preserving the confidentiality of a physician-patient relationship balanced against the employer's need for the medical information." *Bratt*, 467 N.E.2d at 137. It pointed out that "an employer may have a substantial and valid interest in aspects of an employee's ability to effectively perform job duties," *id.*, and concluded that "when medical information is necessary reasonably to serve such a substantial and valid interest of the employer, it is not an invasion of privacy, under 1B [of the Massachusetts privacy statute] for a physician to disclose such information to the employer." *Id.*

In a decision published after *Bratt* but almost three weeks before the district court's second summary judgment order, the Massachusetts Supreme Judicial Court for the first time directly addressed the parameters of a physician's duty of confidentiality. *Alberts v. Devine*, 395 Mass. 59, 479 N.E.2d 113 (1985). The Court found that "in this Commonwealth all physicians owe their patients a duty, for violation of which the law provides a remedy, not to disclose without the patient's consent medical information about the patient, except to meet a serious danger to the patient or to others." *Id.* 479 N.E.2d at 119. This duty "arises from the physician-patient relationship." *Id.* at 120.

The significance of the *Alberts* decision for the privacy standard articulated in *Bratt* is that where there is a physician-patient relationship, the public interest in the confidentiality of that relationship may well outweigh *any* interest in medical information on the part of the employer so that a breach of privacy may result from disclosure not necessary "to meet a serious danger to the patient or others." As a result, we must look closely at Bratt's allegation that Dr. Nugent owed him a duty of confidentiality since the presence of such a

duty will significantly enhance his breach of privacy claim.[1]

Bratt's argument essentially is that regardless of Dr. Nugent's arrangement with IBM, she entered into a physician-patient relationship with him and, therefore, owed him a duty of confidentiality. He testified in his deposition that he believed that everything he said to her would be held in confidence. The record before the district court contains a pamphlet describing an IBM program which provided confidential counseling to employees with psychological problems called the Employee Assistance Program (EAP). The pamphlet states that "[e]mployees will not be sent to the EAP by IBM management," but that "managers may encourage employees to use the EAP as a resource." From this it could be inferred that even if Dr. Nugent was retained by IBM to provide services for it, Bratt could have been under the impression that her services were being offered to him as a private physician whom he could choose to consult freely. This impression was not contradicted by Dr. Nugent, who neither informed him that she would be reporting the results of the examination to IBM nor asked him to sign a disclosure form. Moreover, it was Bratt who initially paid Dr. Nugent's bill, which expense was later reimbursed in part by his IBM major medical insurance and in part by IBM petty cash. The method of payment could also be found to have fostered the impression of a private physician-patient relationship.

The question is whether, under these facts, there could be found a duty of confidentiality owed by Dr. Nugent to Bratt to be factored into his breach of privacy claim. In *Bratt*, the Massachusetts Court observed that "[w]hen an employer retains a physician to examine employees, generally no physician-patient relationship exists between the employee and the doctor."

467 N.E.2d at 136 n. 21. In *Alberts*, the existence of a physician-patient relationship was unquestioned. The Massachusetts Court, therefore, has not addressed the conditions under which a physician-patient relationship is formed. We believe it would find the existence of such a relationship even if the physician is retained by the employer where the patient reasonably believes that a physician-patient relationship has been established and where the physician knew or reasonably should have known that the patient had such an expectation. Under such a rule, we believe that Bratt has alleged sufficient facts to create a "genuine issue of material fact" concerning his contention that Dr. Nugent owed him a duty of confidentiality. We stress that if such a duty is found, it does not give Bratt a separate claim for breach of such duty. See n. 1, *supra*. The duty of confidentiality, and any breach thereof, is a factor to be weighed in determining whether Bratt's privacy rights under the Massachusetts statute were violated by Dr. Nugent.

In addition to the factual question whether Dr. Nugent may have owed Bratt a duty of confidentiality, we also note that if Dr. Nugent was bound by the same internal rules as the IBM medical staff, which is a question of fact, her actions were contrary to the practice set up by those regulations. The effect of these regulations, as we found in our analysis of Count VI, could be found to both increase the substantiality of the intrusion created by her unauthorized disclosure and decrease the reasonable business necessity for this information. Viewing the facts most favorably to Bratt on the issues of confidentiality, degree of intrusion upon privacy, and business necessity for the information, we do not believe that a rational fact finder could only conclude that Bratt's right of privacy had not

---

1. Although Bratt's complaint alleges that Dr. Nugent violated both a breach of privacy and confidentiality, Bratt has never pressed his breach of confidentiality allegation as a claim separate from his breach of privacy claim either below or on appeal. As a result, any separate breach of confidentiality claim Bratt may have

had has been lost. *Wallace Motor Sales, Inc. v. American Motor Sales Corp.*, 780 F.2d 1049, 1067, (1st Cir.1985); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979). Bratt did, however, raise the confidentiality issue as a part of his breach of privacy claim and it is in this context that we consider it.

been breached by Dr. Nugent's disclosures. We, therefore, must reverse the district court's grant of summary judgment for Dr. Nugent on Count VII.[2]

In addition to claiming that the district court erred in granting summary judgment for the defendants, Bratt also contends that the district court erred in deciding the defendants' motion for summary judgment without oral argument despite Bratt's request for one.

Rules 12(c) and 7(e) of the Rules of the United States District Court for the District of Massachusetts state:

> **(c) Request for hearing.** (1) Any party making or opposing a motion who believes that oral argument may be of assistance to the court and wishes to be heard orally shall include a request for oral argument in the motion or opposition to the motion. A party making a motion may also request oral argument in a separate paper filed within 2 days after receipt of the opposition to the motion.
>
> (2) A request for oral argument shall state the amount of time which the party believes will be necessary for both parties to be heard. The request may also include a brief statement of the reasons why the party believes that oral argument is desirable.
>
> . . . .
>
> **(e) Hearing.** If the court concludes that a hearing on a motion is required or, on the basis of a request for a hearing or otherwise, that there should be a hearing on a motion, the motion will be set down for hearing at such time as the court determines.

The implication of section (e) is that the district court will have discretion to decide whether oral argument should be allowed. Bratt makes two distinct claims of error with regard to this rule. The first is that the district court does not have discretion to deny oral argument when it is requested by a party. The second is that, even if the district court does have such discretion, it was an abuse of such discretion to deny oral argument in this case.

We begin with the claim that a district court may not refuse oral argument on a motion for summary judgment when it is requested by a party. Local district court rules are promulgated under Federal Rule of Civil Procedure 78 which permits district courts to "make provision by rule or order for the submission and determination of motions without oral hearing upon brief written statements of reasons in support and opposition" in order "to expedite its business." We have recently held that a district court should have "wide latitude" in determining whether oral argument is necessary before rendering summary judgment. *CIA. Petrolera Caribe Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 411 (1st Cir.1985). There is nothing impermissible in a district court rule granting the court discretion to deny a request for oral argument on a motion for summary judgment.

We now turn to Bratt's argument that the district court abused its discretion in refusing to hear oral argument in this case. Absent a showing of serious prejudice, it is not an abuse of discretion to deny oral argument on a summary judgment motion. *Cf. Jasinski v. Showboat Operating Co.*, 644 F.2d 1277, 1280 (9th Cir.1981) (suggesting but not deciding that prejudice from denial of oral argument is necessary for reversal). The burden on district courts is considerable and eliminating oral argument can save the court valuable time. District court judges must be permitted to assess the need for oral argument in a case without concern that they are creating a *pro forma* ground for appeal. Where the party opposing the motion has had an adequate opportunity to provide the district court with evidence supporting its position and a memorandum of law, we cannot see any prejudice which cannot be rectified by an appeal of the summary judgment itself. Accord *Erco Industries*

---

2. We do not by this reversal of summary judgment mean to imply that the district court is not free to direct a verdict if, after the evidence is received, it finds that there really is no jury issue.

*LTD. v. Seaboard Coast Line R. Co.*, 644 F.2d 424, 431–32 (5th Cir.1981). In this case, Bratt has had since 1980, when the complaint was first filed, to gather and submit evidence to the district court. This was the second time the district court considered this case on motion for summary judgment; the first time was in 1982. On this second go-round, Bratt had from August 1984 to June 1985 to create a record for summary judgment. The record before the district court was substantial and the legal issues for the most part were well defined in the course of the previous summary judgment, the appeal and the SJC's reply to our certification. Despite the fact that we have found that the district court incorrectly granted summary judgment on some of the counts, we cannot see how the denial of oral argument prejudiced Bratt's opportunity to fully present his case to the district court.

■ Finally, we hold, contrary to Bratt's assertion, that the loss of consortium claim raised in Count II is not revived by this action; that claim was premised specifically upon Count I, which claimed intentional infliction of emotional distress. Summary judgment was granted as to Count I by the district court's first order and this claim was later dropped by appellant in light of *Foley v. Polaroid*, 381 Mass. 545, 413 N.E.2d 711 (1980).

We affirm the district court's grant of summary judgment as to Counts III and V. We reverse the district court's grant of summary judgment as to Counts VI and VII.

*Affirmed in part, reversed in part, remanded for further proceedings consistent with this opinion.*

No costs to any party.