ANGELO CEFALU *vs.* GLOBE NEWSPAPER COMPANY (and a companion case between the same parties).

Suffolk.    April 12, 1979. — July 11, 1979.

Present: BROWN, PERRETTA, & KASS, JJ.

*Practice, Civil,* Summary judgment. *Libel and Slander. Privacy. Judge.*

In an action libel against a newspaper which twice published a photograph of a group of individuals, including the plaintiff, standing in line to collect unemployment benefits, in connection with a series of articles about unemployment in Massachusetts, summary judgment was appropriate where the uncontroverted facts developed from the pleadings and affidavits showed no want of due care on the part of the newspaper in taking and publishing the photograph. [73-77]

A newspaper's publication of a photograph of a line of people, including the plaintiff, waiting to collect unemployment benefits did not constitute an invasion of the plaintiff's privacy in violation of G. L. c. 214, § 1B. [77-78]

In an action against a newspaper, the judge who heard argument and entered judgment on the defendant's motion for summary judgment was not required to disqualify himself by the fact that he had

at one time participated in conferences with the law firm representing the defendant when it had represented a relative of the judge in an unrelated action. [78-79]

TWO CIVIL ACTIONS commenced in the Superior Court on November 4, 1974, and January 23, 1975, respectively.

Motions for summary judgment were heard by *DeGuglielmo*, J., a Municipal Court judge sitting under statutory authority.

*Angelo Cefalu*, pro se.

*James F. McHugh* for the defendant.

KASS, J. In connection with stories which it published on April 23, 1973, and on September 29, 1974, The Boston Globe twice published a photograph of persons lined up to collect unemployment benefits at the Hurley Building.[1] That picture included the plaintiff Cefalu, who complains of libel and invasion of privacy.[2] Summary judgments were entered in favor of the defendant and from these judgments Cefalu has appealed. We think no libel or invasion of privacy occurred and affirm the judgments.

We draw the basic facts from the pleadings and the affidavits filed in support of and opposition to summary judgment. Charles Dixon, a Globe photographer, received an assignment from the photo control desk to make a picture of people standing in line to collect unemploy-

---

[1] The Hurley Building is the main office in Boston of the State Division of Employment Security.

[2] The plaintiff has brought two actions. The first complaint was filed November 4, 1974, and, in the first instance, was based only on the second publication. That complaint was twice amended and ultimately referred to both publications, as well as adding a count for invasion of privacy. A second action was filed by Cefalu pro se on January 23, 1975, alleging fundamentally the same grievances as the first complaint. At the time of argument on the motion for summary judgment, the second complaint was withdrawn in open court. On appeal, Cefalu challenges the lawfulness of the dismissal for redundancy of the second action, which was Superior Court, Suffolk County, No. 4385 (1975). On the view we take of the case, the propriety of the disposition of No. 4385 is academic because the entry of summary judgment in the first case, No. 2647, disposes of both cases on the merits.

ment compensation. He went to the Hurley Building and introduced himself by name, affiliation, and purpose to a security guard. That led Dixon to Lucien R. Gagnon, chief supervisor of information of the Division of Employment Security. Gagnon made an announcement that a Globe photographer would take a picture of the line from the rear and that anyone who chose not to be photographed could turn his or her back or step out of line momentarily. Several persons did in fact turn their backs. The plaintiff's visage is one of the few in the crowd which offers a recognizable profile. Cefalu did not hear the announcement.

The April, 1973, publication of the picture accompanied one of a series of articles about the Massachusetts economy and the instalment in question was headlined: "A costly paradox: unemployment is high, but jobs go begging." The photograph itself ran with the caption: "A few of the 185,000 persons out of work in Massachusetts line up at the unemployment office at the Hurley Building in Government Center." Cefalu's presence in the queue, however, was not to collect a check on his own behalf but to act as a translator for a non-English speaking friend who was, indeed, picking up a check. On the occasion of the first publication, Cefalu seems not to have been discomfited, voiced no objection to it to the Globe and, indeed, displayed the photograph at his home. In September, 1974, a Globe weekend news editor, laying out a feature story on unemployment in Massachusetts, selected from the Globe's library file the photograph which had first appeared in April, 1973, and ran the picture again, in much smaller format, with the caption: "Jobless line up for their checks at Division of Employment Security office." Neither publication identified the plaintiff.

1. Since the case comes to us on entry of summary judgment, we must examine the pleadings and affidavits to determine whether they reveal the absence of any dispute over material facts, which would entitle the defend-

ant to the entry of judgment. *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 553-556 (1976). Smith & Zobel, Rules Practice § 56.8 (1977). 6 Moore's Federal Practice § 56.04(1) (2d ed. 1976). In the area of defamation, summary judgment procedures have been described as particularly appropriate because "the stake here . . . is free debate. . . . The threat of being put to the defense of a law suit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Washington Post Co.* v. *Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), cert. denied, 385 U.S. 1011 (1967). See *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 52-53 (1971); *Time, Inc.* v. *McLaney*, 406 F.2d 565, 566 (5th Cir.), cert. denied, 395 U.S. 922 (1969); *Roketenetz* v. *Woburn Daily Times, Inc.*, 1 Mass. App. Ct. 156, 163-164 n.5 (1973). Thus, "where it is unlikely that the plaintiff will succeed on the merits of his claim, courts have been more willing, within the area of libel than elsewhere, to grant summary judgment." *Herbert* v. *Lando*, 568 F.2d 974, 979 n.16 (2d Cir. 1977), rev'd on other grounds, 441 U.S. 153 (1979). But see *Hutchinson* v. *Proxmire*, 443 U.S. 111, 120 n.9 (1979), in which the Supreme Court expresses doubt, without deciding, as to the particular utility of summary judgment in libel cases where "actual malice" is the subject of inquiry.

2. Quite obviously the subject matter of the articles which the photograph embellished, unemployment in Massachusetts, was a subject of public interest. Even if we assume, therefore, that the picture and the context in which it ran made a false and damaging statement[3] about the plaintiff, the defendant newspaper enjoys a privilege which the plaintiff can penetrate only if the photograph

---

[3] We do not reach in this opinion whether the photographs were defamatory so far as Cefalu is concerned. If the picture is to be read merely as saying of Cefalu that he was unemployed, it is not likely that this is actionable. See *Sousa* v. *Davenport*, 3 Mass. App. Ct. 715 (1975). Presumably the plaintiff finds obloquy by association with aspects of the text of the articles which the photograph illustrated.

was published with "malice" in the constitutional sense, i.e., reckless disregard of whether the allegations were true or not, in the case of a public person, *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 279-280 (1964), and negligence as to the facts in the case of a private person. *Stone* v. *Essex County Newspapers, Inc.* 367 Mass. 849, 858 (1975). The *New York Times* decision dealt with the circumstances under which a public official might recover damages for a defamatory falsehood. Three years later, a majority of the Supreme Court extended the constitutional privilege to defamatory criticism of public figures. *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 154-155 (1967). It was in *Rosenbloom* v. *Metromedia, Inc.,* 403 U.S. 29 (1971), that the Supreme Court considered whether the *New York Times* privilege should extend to defamatory falsehoods relating to private persons, if the statements concerned matters of general or public interest. Perhaps because it was so badly divided in *Rosenbloom* v. *Metromedia, Inc.,* the Supreme Court subsequently considered in *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 (1974), the question of the extent of the immunity of the press (whether print or electronic) from liability for defamation to private persons. In that case the Court took note (at 342) of society's interest in assuring to the freedoms of speech and press that " 'breathing space' essential to their fruitful exercise," while recognizing also (at 340) that "[n]either the intentional lie nor the careless error materially advance society's interest in 'uninhibited, robust, and wide-open' debate on public issues." The upshot of the *Gertz* decision was that the States could "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347. This our Supreme Judicial Court did in *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 851 (1975), holding that private persons, as distinguished from public officials and public figures, may recover compensation on proof of *negligent* publication of a defamatory falsehood. "The State's

interest here," Justice Hennessey wrote for the court, "resides in the private individual's right to the protection of his own good name, for this 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.' *Rosenblatt* v. *Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring)." *Id.* at 858.

In testing for negligence, we bear in mind that *Gertz* and, by derivation, *Stone* require that the substance of the material claimed to be defamatory must make substantial danger to reputation apparent. That is, civil liability should not rest on a factual misstatement the content of which did not warn a reasonably prudent editor or broadcaster of its defamatory potential. *Gertz* v. *Robert Welch, Inc.* 418 U.S. at 348. See concurring opinion of Mr. Justice Powell and Mr. Justice Stewart in *Time, Inc.* v. *Firestone*, 424 U.S. 448, 464-465 (1976). In the instant case, involving a subject, as we have noted, of public interest, there was no reason for an editor to suppose that the persons lined up at a desk to receive unemployment payments were there for any purpose other than that which one might expect would place them at such a scene. The photographer, Dixon, was conscientious in ascertaining that the line in question was for such a purpose.[4] Short of the extraordinary step of interviewing each person in the moving line, there were no means for either Dixon or his editors to divine or guess at the plaintiff's unusual reason for being in the public place in which he was photographed. Nor did the articles pertain to a particular face in the crowd, let alone the plaintiff's. Compare *Brauer* v. *Globe Newspaper Co.*, 351 Mass. 53, 56 (1966).

---

[4] We do not think anything turns on the only factual issue on which the parties' affidavits are inconsistent, although not in conflict. The Globe's affidavits say Gagnon made an announcement that the photograph would be taken and Cefalu's affidavits say that neither he nor the person for whom he was acting as a translator heard the announcement. On our view of the case, the Globe was privileged to make and publish the picture without any prior announcement.

To hold a publication liable on these facts would be to demand a standard of such meticulous care as would induce undue self-censorship by the news media. The very speed with which news goes to press or on the air must allow for margins of error in detail and nuance that fall short of intentional falsehood or careless error. "Some degree of abuse," James Madison wrote in the Report on the Virginia Resolutions of 1798, "is inseparable from the proper use of every thing; and in no instance is this more true that in that of the press."[5]

On the uncontroverted facts developed from the pleadings and affidavits, therefore, there was not a want of due care on the part of the defendant newspaper in taking and publishing the photograph which offended the plaintiff.

3. As to the invasion of Cefalu's privacy by publication of the photograph, it is well to bear in mind that the establishment of the right of privacy in this Commonwealth has a statutory basis of relatively recent origin. G. L. c. 214, § 1B, inserted by St. 1973, c. 941. This provides, in relevant part, "A person shall have a right against unreasonable, substantial or serious interference with his privacy." Whatever conduct may rise to a violation of this statute, the publication of the photograph of a line of people in a government building is not it. The notion of right of privacy is founded on the idea that individuals may hold close certain manuscripts, private letters, family photographs, or private conduct which is no business of the public and the publicizing of which is, therefore, offensive. The appearance of a person in a public place necessarily involves doffing the cloak of privacy which the law protects. See *Themo* v. *New England Newspaper Publishing Co.*, 306 Mass. 54, 58 (1940), in which the court said, "The counts in question stated no case unless the plaintiffs under all conceivable circumstances had an absolute legal right to exclude from a newspaper any photo-

---

[5] As quoted in *Gertz* v. *Robert Welch, Inc.*, 418 U.S. at 340.

graph of them taken without their permission. If every person has such a right, no newspaper could lawfully publish a photograph of a parade or a street scene." See also *Broderick* v. *Police Commr. of Boston*, 368 Mass. 33, 44 (1975), cert. denied, 423 U.S. 1048 (1976); *Hastings & Sons Publishing Co.* v. *City Treasurer of Lynn*, 374 Mass. 812, 819 (1978). An extensive discussion of the principles of invasion of privacy appears in Restatement (Second) of Torts §§ 652A-652I (1976). The Restatement distinguishes between publication of a picture taken on a public street (not an invasion of privacy) and a picture taken in a private place (which would be an invasion of privacy). § 652D, Comment b.

4. The plaintiff urges that the judge who heard argument on the motion for summary judgment and who entered summary judgment should have disqualified himself for the reason that he had at one time participated in conferences with the law firm of Bingham, Dana & Gould when it represented a relative of the judge in an unrelated civil action. That firm is counsel to the Globe Newspaper Company. The criteria governing disqualification appear in Canon 3C of the Code of Judicial Conduct, S.J.C. Rule 3:25, 359 Mass. 844-845 (1972). Under Canon 3C a judge should disqualify himself if "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings." Canon 3C (1) (a). He must also disqualify himself if he or a former associate has "served as lawyer in the matter in controversy . . . or the judge . . . has been a material witness concerning it." Canon 3C (1) (b). Other provisions requiring disqualification refer to direct or indirect financial interest. The presiding judge was not encumbered by any of those disqualifications. We do not think that his indirect experience with the defendant's law firm some years previously would reasonably call into question his ability to act impartially on the matter before him. Moreover, the fact and nature of the prior contact between the motion judge and counsel for the

defendant had been voluntarily disclosed by counsel for the defendant to the plaintiff's attorney on the twentieth or twenty-first of September, 1977, in ample time for the plaintiff's attorney to raise any objections on this score at the summary judgment hearing on September 23. The complaint concerning the motion judge's impartiality was made only after the plaintiff learned that the defendant's motion for summary judgment had been allowed.

5. The plaintiff also objects that inadequate notice of the summary judgment hearing was given by the defendant. It is sufficient to observe that plaintiff's counsel made no objection on this score on September 20 when the judge sitting in the assignment session ordered the motions for summary judgment to be heard on September 23, 1977.

The plaintiff has presented his case on appeal pro se and has done so creditably. A theme pervades his briefs that anything less than the full panoply of a jury trial denies him due process. This is an untrained view of due process of law. A just concern for the rights of the parties[6] and First Amendment freedoms requires that this case be closed at that stage where uncontroverted facts preclude a cause of action.

*Judgments affirmed.*

---

[6] The defendant has argued that the appeal should be dismissed because not timely docketed in this court. We have examined the record carefully and find insufficiently clear and compelling bases for so doing.