Lauriat, J.
This motion for partial summary judgment, part of a case involving, inter alia, allegations of libel and invasion of privacy arising from intense publicity over medical errors that led to the death of a patient at a prestigious Boston hospital, raises difficult issues of media law: when is an event “newsworthy,” and when can this issue be decided by the court as a matter of law?
For the reasons that follow, the court concludes that the events reported in the media accounts at issue were indeed newsworthy as a matter of law. Accordingly, the court allows the motion of defendants The Boston Globe (“the Globe”) and Richard A. Knox (“Knox”) for summary judgment on the claim of plaintiff Doctor Lois Ayash (“Ayash”) for invasion of privacy (Count VII of the Complaint).
BACKGROUND
On December 3, 1994, Betsy Lehman (“Lehman”), a columnist for the Globe, died at the Dana Farber *177 Cancer Institute (“Dana Farber”). Lehman was a patient in an experimental breast cancer treatment protocol (“the protocol") for women whose cancers had not been responsive to more traditional forms of treatment. The protocol was designed to test on women the efficacy and safety of high doses of cyclophosphamide, a drug used in chemotherapy. The plaintiff in this action, a physician at Dana Farber, was Protocol Chair, which gave her responsibilities relating primarily to the research aspects, as opposed to the clinical management, of the protocol.
In February 1995, a data clerk at Dana Farber discovered that Lehman and another patient in the protocol had accidentally been given overdoses of cyclophosphamide in November 1994. Due to a physician’s error in interpreting protocol doses, the two patients were given four times the prescribed dose. Dana Farber officials, following this discovery, suspended the clinical privileges of two physicians who had been directly involved with the treatment of the two patients when the overdoses occurred. Both physicians were also placed on administrative duty. No action was taken then against Ayash, who did not have any direct clinical responsibilities for the patients at the time of the overdoses.[1]
On March 23, 1995, defendant Knox, a reporter for the Globe, published an article in that newspaper pertaining to the overdoses given to Lehman and the other patient. The article identified Ayash as both “the leader of the team” and a co-signatory of the order which led to the overdoses, and implied Ayash had been placed on administrative duty. As stated above, Ayash was not the clinical “leader” of the program; nor did she co-sign the overdose order. Another Knox article appeared on March 26, 1995. Additionally, Globe editorials were published which excoriated Dana Farber and its physicians for the overdoses.
On March 31, 1995, Dr. Ayash’s clinical privileges were suspended and she was assigned to administrative duty. Additionally, two internal Dana Farber investigations of her conduct began. On May 2, 1995, Knox published an article in the Globe stating that Ayash and another physician had been “singled out in an internal disciplinary process launched last month by Dana Farber.” On June 4, 1995, the Globe published a "correction,” stating that Ayash had been erroneously identified in the original Knox article as having countersigned the overdose order.
Another Knox article appeared on October 31, 1995, which discussed internal Dana Farber documents relating to the investigations of the overdoses. Although Dana Farber had publicly released some materials relating to the investigations, Knox’s article also stated that a non-public summary of an internal investigation had been “obtained by the Globe.” The article also stated that Ayash was under investigation by the Massachusetts Board of Registration in Medicine.
In August 1995, Ayash received an oral reprimand by the president of Dana Farber for her alleged failure to detect the overdoses earlier than the point at which they were discovered.
DISCUSSION
Summary judgment must be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). With respect to any claim on which the party moving for summary judgment does not have the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp. 410 Mass. 706, 716 (1991). “If the moving pariy establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson v. Time, Inc., 404 Mass. at 17. The opposing pariy cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
I.
The Globe has moved for summary judgment on Ayash’s invasion of privacy claim brought under G.L.c. 214, § IB (Count VII). The tort of invasion of privacy is of relatively recent vintage, and has been called “one of the most noteworthy legal inventions of the 20th Century." The Florida Star v. B.J.F., 491 U.S. 524, 550 (1989) (White, J. dissenting). The development of a legal action for public exposure of private, personal facts is traced to an article by Samuel D. Warren and Louis D. Brandeis, “The Right to Privacy,” 4 Harv.L.Rev. 193 (1890). Another landmark in the development of this tort came with the publication of Dean Prosser’s “Privacy," 4 Cal.L.Rev. 383 (1960), which discussed what are now recognized as the four types of invasion of privacy. See also Restatement of Torts 2d, §652A.[2]
Massachusetts has codified the right to privacy in G.L.c. 214, §1B, which creates a right “against unreasonable, substantial or serious interference” with a person’s privacy. Although the Supreme Judicial Court has never decided whether or not to recognize a common law invasion of privacy right, see Alberts v. Devine, 395 Mass. 59, cert. denied, 474 U.S. 1013 *178 (1985), c. 214, §1B is considered roughly analogous to the common law categoiy which proscribes public disclosure of private facts. Restatement of Torts 2d, §652A(2)(c); Bratt v. International Business Machines Corp., 392 Mass. 508, 519, n.15 (1984).
A.
In her brief, Ayash asserts that her claim belongs to the public disclosure species of invasion of privacy, which makes actionable disclosures of private, intimate facts about an individual that are not in any sense the business of the public or newsworthy. Doe v. Town of Plymouth, 825 F.Supp. 1102, 1109 (D.Mass. 1993) (disclosure of HIV status actionable). A disclosure is an invasion of privacy where private facts are revealed that would be offensive to a reasonable person and where the public has no legitimate interest in the facts being disclosed. Id; Restatement of Torts 2d, §652D. “When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy.” Restatement of Torts 2d, §652D, comment d. Thus, in cases involving the media, “newsworthiness" is a complete defense to an invasion of privacy action, even if the plaintiff establishes that private, offensive facts about her have been disclosed. See, e.g, Gilbert v. Medical Economics Co., 665 F.2d 305, 309 (10th Cir. 1981); Cefalu v. Globe Newspaper Co., 8 Mass.App.Ct. 71, 74 (1979), cert. denied, 444 U.S. 1060 (1980).
The Massachusetts appellate courts have had limited opportunities to address invasion of privacy claims brought against the media. In Cefalu, 8 Mass.App.Ct. 71, the Appeals Court held that a news photograph of a man in an unemployment line was as matter of law of public interest, and that summary judgment was proper on the man’s invasion of privacy claim against the Globe. However, Cefalu is distinguishable from the present case in important respects; there, the plaintiff was photographed in a public place, lending strength to the argument that the matter was of public interest. Here, by contrast, some of the information published about Ayash was both generated in private and was legally privileged.
Cefalu does not outline a test for assessing newsworthiness. Nor is the court prepared to find on the authority of Cefalu that newsworthiness is invariably a question of law, even though summary judgment was granted in that case. Faced with an absence of state authority on this important question of media law, the court will examine the decisions of other jurisdictions and attempt to formulate a reasoned test for assessing newsworthiness.
B.
In addressing the preliminary matter of whether newsworthiness is a question of fact or of law, the court notes that summary judgment is favored in cases involving the right of media to publish information, “because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights.” Sipple v. Chronicle Publishing Co., 154 Cal.App.3d 1040, 1046 (1984). This may be especially true in a “public disclosure” privacy action, which is notably different from a defamation action, the other main legal recovery route for disclosures in newspapers, in that it permits recovery for truthful disclosures. Romaine v. Kallinger, 537 A.2d 284, 292 (N.J. 1988). A review of cases from other jurisdictions shows that the issue of newsworthiness has been treated of one of either fact or law depending on the circumstances presented. See, e.g, Virgil v. Time, 527 F.2d 1122, 1130 (9th Cir. 1985); Gilbert, 665 F.2d at 309. Thus, whether newsworthiness is a question for the judge or the jury depends upon the weight of the summary judgment record. Where material facts are in dispute, or where the facts present a particularly close question as to newsworthiness, summary judgment is inappropriate. As in other cases, the initial determination of whether or not a factual question exists is for the court. Virgil, 527 F.2d at 1130.
Turning to the issue of a legal test for assessing the newsworthiness of disclosed private facts, it is clear that establishing viable doctrine in this area has not been an easy task. See "Trafficking in Stolen information,” 105 Yale Law J. 727, 732 (1995) (criticizing courts’ tests for determining newsworthiness as inconsistent and incoherent).
One of the ironies of this case and others like it is that the newsworthiness of private facts is invariably assessed by courts after those facts have been trumpeted by the news media. Indeed, it is almost a truism that the newsworthiness of a person or event can be fostered, if not created, by news reporting rather than as a result of any intrinsic public interest in the person or event:
Pushed to the extreme, the newsworthiness defense engulfs the tort of public disclosure, because, to a large extent, the media themselves determine what is newsworthy.
“Tort of Public Disclosure,” 1990 Wisc.Law.Rev. 1107, 1121.
However, the court also notes that the media’s privilege to publish newsworthy matters is not only an immunity accorded by the common law, but also one of constitutional dimension based upon the First Amendment of the United States Constitution. Sipple, 154 Cal.App.3d at 1046; Restatement of Torts, 2d, §652E, comment d. Thus, courts have generally concluded that publishers, not judges or juries, are the appropriate judges of what is newsworthy. Heath v. Playboy Enterprises, 732 F.Supp. 1145, 1149 (S.D. Fla 1990). “Only in cases of flagrant breach of privacy .. . or obvious exploitation of public curiosity . . . should a court substitute its judgment for that of the publisher." Doe v. Sarasota-Bradenton Florida Television Co., 436 So.2d 328, 331 (Fla.App. 1983).
In assessing newsworthiness, courts examine the subject of the news report at issue and the logical nexus between this subject and any private facts *179 revealed about the plaintiff. See, e.g, Virgil, 527 F.2d at 1130-31 (general subject of body surfing in article was newsworthy, but factual question existed as to whether “bizarre” and unrelated facts disclosed about plaintiff were newsworthy); Gilbert, 665 F.2d. at 309 (policing medical profession newsworthy).
After a review of cases from other jurisdictions, the court adopts the following test; disclosures of truthful, private facts are newsworthy, as matter of law, where (a) the general matter at issue is one that is typically of public concern, and (b) the private facts disclosed are closely related to that matter of public concern.
C.
Turning to the present case, the defense of newsworthiness arises only if Ayash can meet her prima facie case by showing that private facts were disclosed about her that would be offensive to a reasonable person. The court finds an issue of material fact on these matters. At least some of the information disclosed about Ayash came from internal Dana Farber documents that are by law confidential. Certainly, facts in such documents could be found to be “private.” See Virgil, 527 F.2d at 1130-31.
The court also finds a factual question regarding whether a reasonable person would have been offended by the disclosures that occurred. Certainly, a juiy could find that Ayash was reasonably distressed and offended by at least some of the information published about her. Damaging, employment-related information about Ayash — again, some of it from legally privileged documents — was placed directly in the public eye. See, e.g, Cape Publications, Inc. v. Bridges, 423 So.2d 426, 427-28 (release of nude picture could have been distressing to crime victim). Under the circumstances, Ayash reasonably could have been offended by the disclosures.
Since issues of material fact exist as to whether Ayash can establish a prima facie case of “public disclosure” invasion of privacy, the court must now address whether the newsworthiness defense nevertheless allows disposition of her privacy claim as a matter of law. First, the court must assess whether the general subject at issue in the reports about Ayash is one that is typically of public concern. This determination is complicated in the present case by the fact that Lehman was herself a reporter for the Globe. Ayash asserts — with good reason — that Lehman’s association with the Globe prompted unusually intense media interest in the case. Certainly the editorials and columns about the Lehman case were highly personalized, and reflected the anguish of other Globe staffers over Lehman’s death.[3] Even Knox’s news accounts, and the headlines placed over them, at times lacked the dispassion that is supposed to be the hallmark of quality journalism.[4]
However, there is no evidence that absent Lehman’s involvement in the story, the Globe would not have zealously pursued it. Regardless of who may have died at Dana Farber as a result of this incident, the events have been of public interest. Deficiencies in health care are generally a matter of public concern. Gilbert, 665 F.2d. at 309 (policing medical professional newsworthy). See also ELM Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass 779, 782-83 (1989). The stories which mentioned Ayash focused on two major, life threatening errors at a renowned cancer research center. The court concludes, as a matter of law, that the general subject of the reports that mentioned Ayash was of public concern.
Turning to the second prong of the newsworthiness test, the court also determines, as a matter of law, that the specific facts disclosed about Ayash were closely related to the matter of public concern discussed in the articles. Certainly, a relevant factor in considering this prong is whether the individual involved is one who typically receives public attention. Ayash, at least prior to the disclosures about her, was in no sense a public figure. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1973). However, having been “drawn into a particular public controversy,” id. at 351, shearguably became a public figure for a limited range of issues. The reportage on her did not go beyond the scope of those issues. No lurid or extraneous details about her were disclosed. The reports focused only on the degree to which she was allegedly professionally involved in the errors at Dana Farber.
In sum, the Globe has met its burden of showing an absence of any factual dispute regarding whether ¡the information disclosed about Ayash was newsworthy. Neither the general subject discussed in the reports nor the specific facts disclosed about Ayash were in any sense far afield from issues of public concern. The information was newsworthy as a matter of law, and no invasion of privacy action may lie against the Globe.
D.
Ayash, in an additional effort to establish either a common law invasion of privacy action or a G.L.c. 214, §1B claim, makes the intriguing argument that since a violation of G.L.c. 111, §204, the medical peer review statute, occurred in this case, there is a factual question as to whether a substantial invasion of privacy occurred.
Paragraph (a) of G.L.c. 111, §204, erects a general shield of confidentiality for “proceedings, reports and records of a medical peer review committee.” This statute was passed in order to foster “rigorous and candid evaluation of professional performance by a provider’s peers.” Swatch v. Treat, 41 Mass.App.Ct. 559, 561 (1996); Beth Israel Hosp. Assn. v. Board of Registration in Medicine, 401 Mass. 172, 182-83 (1996). The statute provides that the work product of a medical peer review is “confidential, and shall not be subject to subpoena or discovery, or introduced into evidence.”
*180 The language of the statute, as well as case law construing it, demonstrates that its purpose was to make medical peer review material privileged and not discoverable in litigation. The statute precludes medical institutions from releasing internally generated materials and prohibits outside parties from obtaining such materials through legal mechanisms such as discovery.
Ayash contends that when medical peer review material is obtained and disseminated by a newspaper reporter, the reporter has violated G.L.c. 111, §204. By extension, she argues, the dissemination of such statutorily protected material constitutes an invasion of privacy and thus a violation of G.L.c. 214, §1B.
Absent this sort of implied private right of action, Ayash argues, the statute is rendered toothless; for example, a hospital official who releases peer review material in violation of the statute faces absolutely no sanction, and any third party (e.g., a reporter) who disseminates this information likewise faces no adverse consequences.
The court disagrees with the view that absent a private right of action, the statute is a near nullity. This particular statute — like several others in the Commonwealth — makes a certain category of information privileged and hence immune from discovery. The Legislature, had it intended a either a specific sanction for a statutory violation or a private right of action to exist, could have so provided. See Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 841 (1977) (Virginia statute made it criminal offense to divulge information relating to a particular state commission).[5] Further, even absent either of these remedial avenues, the statute gives medical institutions the powerful ability to keep their peer review materials from potential litigants. This is appropriate, since the statute was passed “in response to a perceived medical malpractice crisis.” Beth Israel, 401 Mass. at 173.
Further, Ayash’s argument is foreclosed by Landmark Communications, Inc. v. Virginia, 435 U.S. 829 (1977). There, the Supreme Court found unconstitutional a statute making it a misdemeanor to publish information regarding proceedings before a state judicial review committee. Just as the Landmark criminal statute was found to have an unconstitutionally chilling affect on the media’s First Amendment rights, the civil remedy sought by Ayash would have the same effect. The following language from Florida Star, 491 U.S. at 534, where the Court declared void as unconstitutional an action against a newspaper for publishing lawfully obtained information, is also instructive:
To the extent sensitive information is in the government’s custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government’s mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.
Florida Star, 491 U.S. at 534 (emphasis added). Cf. Time v. Hill, 385 U.S. 374 (1967) (applying Constitutional standards for libel claims to false light invasion of privacy action).
The court declines to recognize a private right of action against a third party who obtains and disseminates material covered by the medical peer review statute.
E.
Although not raised in her brief, Ayash spent considerable time at oral argument advocating a “false light” invasion of privacy theory. See Restatement of Torts 2d, §652A(d). A false light invasion of privacy action is quite similar to a defamation action, in that it seeks to recover for the publication of erroneous or misleading information. However, Massachusetts has not recognized the false light category of the invasion of privacy tort. ELM Medical, 403 Mass. at 787.
This court also declines to do so. Ayash’s false light invasion of privacy claim is, in the circumstances presented, essentially duplicative of her defamation claim. She seeks damages for allegedly false information printed in the Globe about her. See Grimsley v. Guccione, 703 F.Supp. 903 (M.D. Ala. 1988) (no false light action allowed where defamation action existed). There is no compelling need for the court to recognize the false light theory in this case.
ORDER
For the foregoing reasons, Defendants Globe Newspaper Company and Richard A. Knox’s Motion for Summary Judgment as to Count VII of the Complaint is ALLOWED.

 Ayash did rotate into the clinical role of attending physician for Lehman and the other patient on December 1, 1994. Although Lehman had suffered an adverse reaction to the cyclophosphamide treatment, Ayash did not discover that the overdoses had occurred.

 The four categories of invasion of privacy recognized by the Restatement are:
(a) Unreasonable intrusion upon the seclusion of another;
(b) Appropriation of the other’s name or likeness;
(c) Unreasonable publicity given to the other’s private life;
(d) Publicity that unreasonably places the other in a false light before the public.
Restatement of Torts 2d, §652A(2).

 Globe columnist Bella English wrote of the incident:
Betsy should be alive today . . . Young women ordinarily do not die of cardiac arrest. . . The sheer incompetence takes your breath away. Let’s start with the incompetence, which is nothing less than criminally negligent homicide. The staffers with their fingerprints on this death ... killed Betsy just as surely as if some driver had run a stop sign and hit her.

 The headline in the original Knox story read, “Doctor’s orders killed cancer patient.”

 However, as discussed below, a statute that allowed either a criminal or civil remedy against a third parly (e.g, a newspaper reporter) who disclosed confidential, but lawfully obtained governmental information, would likely be unconstitutional. The Virginia statute in Landmark was voided by the Supreme court on the grounds that it violated the media’s First Amendment rights.