Gants, J.
The plaintiff, Jean DiGirolamo (“DiG-irolamo”), received workers’ compensation benefits after breaking her leg while working as a skate guard at a Metropolitan District Commission rink. The Public Employment Retirement Administration retained a private investigative agency, the defendant D.P. Anderson & Associates, Inc. (“D.P. Anderson”), to conduct a visual surveillance of Ms. DiGirolamo to determine whether she was mobile and physically active. During the course of the visual surveillance, the investigators watched DiGirolamo’s fourth-floor apartment while sitting in a car parked on a public street, observing her movements inside the apartment and when she walked out on the balcony, videotaping and photographing her when the opportunity arose. After learning of the surveillance at a hearing of the Industrial Accident Board, DiGirolamo filed suit against D.P. Anderson, alleging an invasion of privacy in violation of G.L.c. 214, §1B and negligent infliction of emotional distress.[1] D.P. Anderson now moves for summary judgment. After hearing and for the reasons stated below, the motion for summary judgment is ALLOWED.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen ofHingham, 419 Mass. 535, 539 (1995). Consequently the facts stated below are presented in the light most favorable to DiGirolamo and should not be misunderstood as findings of the Court.
On December 21, 1985, DiGirolamo broke her leg on the ice of a Metropolitan District Commission rink where she worked as a skate guard. She sought and received workers’ compensation benefits from her employer. At the Department of Industrial Accidents hearing in August 1995, she learned for the first time that, as a result of her workers’ compensation claim, D.P. Anderson had conducted visual surveillance of her and had made a videotape that showed her walking around her apartment without the use of crutches or a cane.[2] In fact, D.P. Anderson had conducted visual surveillance of her on five separate days: D.P. Anderson investigator Frank Valle surveilled her on January 26 through 28, 1994 and investigator John Valeri surveilled her on May 23 and June 7,1995. Valle admits to videotaping her, but not when she was in her apartment or on her balcony; Valeri admits to photographing her when she was on her balcony, but not when she was in her apartment.
At the time of the surveillance, DiGirolamo lived in a condominium complex at 881 Broadway in Everett. Her condominium was on the fourth floor, which was effectively the fifth floor because there was a basement that was actually the ground floor. Off of the living room of her condominium was a three-panel sliding glass door that led into a small balcony. The sliding glass door faced the main parking lot but was plainly visible from the street. The two investigators surveilled her when she was in her apartment from a car that was parked on that street. From that vantage point, they had a clear view of the balcony, albeit from a considerable distance. There is no allegation that the investigators trespassed onto private property in order to observe DiGirolamo in her home or on her balcony.
DISCUSSION
The statutory tort of invasion of privacy derives from G.L.c. 214, §1B, which provides:
A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.
While the language of the statute makes it appear that it is sufficient to show that the interference with privacy was either unreasonable or substantial or serious, the Supreme Judicial Court has made it clear that the plaintiff must show that the interference was unreasonable and either substantial or serious. Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 517-19 (1991); O’Connor v. Police Commissioner of Boston, 408 Mass. 324, 330 (1990).
Given the breadth of these terms and the inherent uncertainly as to their meaning, courts are expected *138 to define the scope of the right to privacy “on a case-by-case basis, by balancing relevant factors, . . . and by considering prevailing societal values and the ability to enter orders which are practical and capable of reasonable enforcement.” Schlesinger, supra at 519. The case at bar presents such a challenge. It directly poses the questions of whether it constitutes a violation of the statutoiy right to privacy for a private investigator, who did not physically trespass on private property:
1. to look through someone’s window into her apartment with the naked eye;
2. to look at someone with the naked eye when she walks out onto a balcony;
3. to photograph, videotape, or look at someone with some degree of enhanced vision, such as a telescopic lens, when she walks out onto a balcony; or
4. to photograph, videotape, or look at someone with enhanced vision while she remains inside her home.
As discussed below, I conclude that only the fourth factual scenario constitutes an unreasonable and substantial or serious interference with the right of privacy in violation of G.L.c. 214, §1B.
In examining these questions, let me begin by acknowledging that it is perfectly appropriate for a private investigator to conduct a visual surveillance of a person who has applied for workers’ compensation benefits in order to guard against the possibility of a fraudulent or inflated claim. See, e.g., Forster v. Manchester, 410 Pa. 192, 189 A.2d 147 (Supreme Ct. 1963). To the extent that the visual surveillance by the investigator consists of observing, photographing, or videotaping a person in a public place, it violates no right of privacy. See Cefalu v. Globe Newspaper Co., 8 Mass.App.Ct. 71, 77 (1979) (“The appearance of a person in a public place necessarily involves doffing the cloak of privacy which the law protects”).[3] The more difficult issue, posed here, is whether visual surveillance crosses the line and becomes an invasion of privacy when the investigator is surveilling an individual’s activities on her balcony or in her home. To the extent practicable, the line separating appropriate investigation from an invasion of privacy should be clearly drawn so that investigators may know when they are crossing or approaching that line. See Schlesinger, supra at 519 (the Legislature intended courts to fashion orders under G.L.c. 214, §1B that “are practical and capable of reasonable enforcement”).
In determining whether an investigator commits an unreasonable and substantial or serious interference with privacy by peering through someone’s window into her home or by watching someone on her balcony, we can seek guidance from the criminal law cases that have determined when such intrusion infringes upon a reasonable expectation of privacy and thereby constitutes a search under the Fourth Amendment. See Katz v. United States, 389 U.S. 347, 361 (1967); Smith v. Maryland, 442 U.S. 735, 740 (1979); Vega-Rodriguez v. Puerto Rico Telephone Company, 110 F.3d 174, 178 (1st Cir. 1997). An expectation of privacy is reasonable if the complainant has an actual expectation of privacy and the expectation is one that society recognizes as reasonable. Oliver v. United States, 466 U.S. 170, 177 (1984); Smith, supra at 740; Vega-Rodriguez, supra at 178. In the seminal case of United States v. Taborda, 635 F.2d 131 (2d Cir. 1980), the Second Circuit considered whether a visual surveillance conducted into the activities of one apartment through a telescope located in another apartment infringed upon a reasonable expectation of privacy. The Court concluded:
[Observation of objects and activities inside a person’s home by unenhanced vision from a location where the observer may properly be does not impair a legitimate expectation of privacy. However, any enhanced viewing of the interior of a home does impair a legitimate expectation of privacy and encounters the Fourth Amendment warrant requirement, unless circumstances create a traditional exception to that requirement.
Id. at 139.
It is both sensible and administrable to apply this reasonable expectation of privacy analysis, which recognizes a dichotomy between unenhanced vision and enhanced vision, that is, between the use of the naked eye and the use of some type of telescopic lens in binoculars, a telescope, camera, or video camera, to the determination of when an interference with privacy is substantial or serious. It is sensible because persons understand what can be seen inside their home through the naked eye by those standing beyond their property, and can take appropriate steps to protect their privacy from what can be seen from the street or a neighboring apartment. It is much more difficult to gauge what can be seen through the use of a telescopic lens. Given the potential power of such lenses, with the proper angle of sight, virtually everything could be seen through an undraped window. The mere fact that telescopic lenses are powerful and becoming increasingly common does not mean that, as a society, we must reasonably expect to be watched through them when we are inside our homes unless we pull our drapes or close our shutters. In other words, that which can be seen with the naked eye without trespassing is in plain view; that which only can be seen with a telescopic lens is not. United States v. Kim, 415 F.Supp. 1252, 1256 (D. Haw. 1976) (“the ‘plain’ in plain view must be interpreted as permitting only an unaided plain view”). See also, Vega-Rodriguez, supra at 180. If, as a matter of law, a person has no reasonable expectation of privacy in what can be seen with the naked eye in plain view, it is difficult to understand how that type of intrusion, as a matter of law, can be found to be substantial or serious. It makes far more sense for the law to declare that an interference *139 with privacy can be substantial or serious only when the interference invades a realm where the complainant holds a reasonable expectation of privacy.
Establishing a dichotomy between unenhanced and enhanced vision sets an administrable legal standard because investigators can recognize that, if they are not trespassing, they are acting lawfully if they are conducting a visual surveillance with the naked eye alone. Once they pick up a pair of binoculars or a camera with a telephoto lens, they are on notice that they may not use those visual aids to look inside one’s home.
Applying this analysis to the case at bar, DiGirolamo must prove as an element of her privacy claim that at least one of the two investigators used enhanced vision in observing her activities inside her home. From the evidence in the summary judgment record, she has no reasonable likelihood of proving this essential element. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Frank Valle, the investigator who sur-veilled her on January 26-28, 1994, admitted that during the surveillance he was in possession of binoculars and a video camera with a telephoto lens. He denied ever using the binoculars during the surveillance. He admitted that he videotaped DiGirolamo but denied that he videotaped her when she was in her home or on her balcony. The videotape itself has been lost so it cannot serve to rebut this testimony. At the Department of Industrial Accidents hearing in August 1995, DiG-irolamo heard the Commonwealth’s attorney tell the judge that the videotape showed her walking around her apartment, but this assertion is hearsay and not admissible to prove the truth of the fact asserted — that the videotape indeed contains such footage.[4] DiGirolamo points to Valle’s report of this surveillance, which would be admissible both as an admission and a business record, as contradicting his sworn testimony and demonstrating his use of enhanced vision.[5] In that report, he wrote that DiGirolamo on January 26, 1994 moved freely around her apartment without a cane and without any apparent pain or discomfort. She engaged in domestic activity within the apartment, including moving unidentified objects. She did not “exhibit a limp or physical restrictions of her lower extremities, particularly her right leg,” and “(h]er gait appeared normal as she swiftly moved throughout the apartment.” He also described the clothing she wore inside her home: a green top and dark slacks.
Given Valle’s vantage point, roughly 100 yards away from the apartment building, with a clear view of the sliding glass door off DiGirolamo’s balcony, these observations are insufficient as a matter of law to raise a triable issue of fact as to whether Valle could not have seen what he saw without enhanced vision. While DiGirolamo points to the apparent contradiction in Valle’s testimony that he could see all of this even though he admitted that the balcony blocked his view of the lower 80 percent of her body, this contradiction speaks to the angle of his sight, not to the enhancement of his vision. DiGirolamo does not contend that Valle used a periscope or any other means to adjust for the angle of sight; she simply contends that he could see more than the naked eye could see from that angle of sight.[6] The evidence in the summary judgment record is inadequate to permit her to prove this contention.
John Valeri, the investigator who surveilled her on May 23 and June 7-8, 1995, admitted that he possessed a videocamera and a camera with a powerful telescopic lens during the surveillance, and that he both videotaped and photographed DiGirolamo when she came out onto her balcony. The photograph of DiGirolamo on her balcony taken by Valeri permits the inference that he used a telescopic lens. However, Valeri testified that he did not look inside DiGirolamo’s apartment, and his report reflects no observations of what DiGirolamo did inside her apartment. It speaks only to her movements on the balcony. This evidence is insufficient as a matter of law to show that Valeri used enhanced vision to watch DiGirolamo in her apartment, but is sufficient to show that enhanced vision was used to observe DiGirolamo on her balcony. Therefore, this Court must determine whether DiG-irolamo has the same reasonable expectation of privacy in being observed on her balcony with enhanced vision as she has in being observed with enhanced vision inside her apartment. I hold she does not.
DiGirolamo’s balcony faced the parking lot of her apartment house and was plainly visible from the street. When she went out onto that balcony, she was in plain view of anyone on that street, especially since she was four floors high. For all practical purposes, she was as visible, perhaps more visible because of the moderate height of the balcony, than someone on the street. Therefore, while standing on her balcony, she enj oyed no greater right to be free of enhanced viewing than she did while standing on the street. See United States v. Kim, 415 F. Supp. at 1257 (“The surveillance of activities on his balcony, if standing alone, might very well not have invaded Kim’s privacy and therefore not have constituted a search”). See also, Cefalu v. Globe Newspaper Co., 8 Mass.App.Ct. at 77-78. Given its proximity to the street, DiGirolamo’s balcony was not a private place and was not entitled to the same privacy protection as the interior of her home. See Cefalu, supra at 78 (photograph not taken in a private place is not an invasion of privacy).[7]
In conclusion, this Court finds, as a matter of law, that the observation of someone inside her home with only the naked eye, without a physical trespass, does not by itself constitute an unreasonable and substantial or serious interference with privacy under G.L.c. 214, § IB. It further finds that the evidence in this record is inadequate as a matter of law to raise a genuine issue of material fact as to whether the defendant’s investigators used enhanced vision to observe the plaintiff inside her apartment. Finally, it finds that the plaintiffs balcony, being in plain view from the street, was not a *140 private place and that the observation and photographing of the plaintiff with enhanced vision while on that balcony, as a matter of law, did not by itself constitute an unreasonable and substantial or serious interference with privacy under G.L.c. 214, §1B. Summary judgment must therefore be allowed on the plaintiffs claim under G.L.c. 214, §1B.
The negligent infliction of emotional distress claim also cannot survive. Emotional distress damages would have been among the remedies available under G.L.c. 214, §1B had the privacy claim survived. Jean Clement v. Sheraton-Boston Corporation, Civ. No. 93-0909F (Suffolk Cty. Feb. 21, 1997) (Doerfer, J.) at 8-10. A cause of action for negligent infliction of emotional distress, however, has at least two required elements for which there is no evidence in the record. First, there must be an allegation of negligence; the wrongful conduct alleged here by the investigators was intentional. Second, there must be evidence, generally accompanied by expert testimony, that the emotional distress caused by the negligence resulted in “physical harm manifested by objective symptomatology.” Payton v. Abbott Labs, 386 Mass. 540, 557 (1982). No such evidence has been proffered. As a result, summary judgment must also be allowed on the negligent infliction of emotional distress claim.
ORDER
For the reasons stated above, the defendant’s motion for summary judgment is ALLOWED as to all Counts of the plaintiffs complaint.

 DiGirolamo had originally also alleged the unauthorized use of her image in violation of G.L.c. 272, §99, but this Count has been voluntarily dismissed.

 DiGirolamo has never seen the videotape and it was not produced in discovery, so its actual contents are not part of the record. The only reflection in the summary judgment record of what it contained is DiGirolamo’s deposition testimony that the attorney for the Commonwealth at the Department of Industrial Accidents hearing told the administrative judge that it showed her walking around her apartment without the use of crutches or a cane.

 In Ellis v. Safety Insurance Company, 41 Mass.App.Ct. 630 (1996), the Appeals Court held that a triable claim of an invasion of privacy under G.L.c. 214, § IB was made out when the plaintiffs presented evidence that the insurance company investigator followed the plaintiffs around, sat in a car in front of their home, called them at home and work, and asked them how a black person could afford so expensive a car. However, I do not interpret this case to hold that an investigator’s physical surveillance of an individual, by itself, is sufficient to permit a privacy claim to be tried. In Ellis, the plaintiffs alleged that the investigator committed racially motivated acts of harassment. Id. at 631. Otherwise lawful conduct may become unlawful if done with a racial animus or with a purpose to harass. No such animus or improper purpose is alleged regarding the visual surveillance conducted here. The focus is simply on whether the surveillance itself, by itself, raises a triable claim of an invasion of privacy.

 The assertion would be admissible at trial, but only for the limited purpose of proving that DiGirolamo heard it, since she claims that her emotional distress commenced after she learned at the hearing of the existence of such a videotape.

 That report is signed by Stuart Franco, D.P. Anderson’s Operations Manager, but the evidence shows that it was written solely by Valle.

 It should also be noted that this report, prepared well before Valle had any idea that his surveillance would be the subject of a law suit, corroborates his testimony that he did not videotape DiGirolamo’s activities inside her home. He wrote that he videotaped her only when she left her car and entered her building. There is also no reference to the use of binoculars.

 The privacy analysis of DiGirolamo’s balcony is specific to the undisputed facts of this case. Certainly, there are other balconies that, because of their isolation or their height, are not readily seen from the street and may warrant a different privacy analysis.